**UNITED STATES DISTRICT COURT**

**DISTRICT OF ALASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **3:07-cr-00055 JWS** |
| | ) | |
| vs. | ) | **ORDER AND OPINION** |
| | ) | |
| VICTOR H. KOHRING , | ) | **[Re:   Motion at Doc. 36]** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  MOTION PRESENTED

At docket 36, defendant Victor Kohring moves to transfer this case from the District of Alaska to the Western District of Washington.  The United States opposes the motion.  Oral argument has not been requested and would not assist the court.

## II.  BACKGROUND

Kohring is a former member of the Alaska Legislature.  The Indictment in this case charges him with four felonies, all relating to his legislative office.  Count 1 charges that he conspired to commit extortion and attempted extortion under color of official right, and bribery in violation of 18 U.S.C. § 371.  The Indictment also includes one count of interference with commerce by extortion induced under color of official right in violation of 18 U.S.C. § 1951(a), and an additional count of attempted commission of that crime.  In the last count, Kohring is charged with bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B).

The charges against Kohring are similar in nature to charges brought against three other former members of the Alaska Legislature: Tom Anderson, Peter Kott, and

Bruce Weyhrauch. Kohring, unlike the other three, was still a member of the Alaska Legislature when he was indicted.[1] After suggestions were made by Governor Palin and others that Kohring's indictment would render it difficult for him to represent his constituents, Kohring resigned his seat in the legislature.

Anderson was tried and convicted on July 9, 2007, after a ten-day trial of one count of conspiracy to commit extortion under color of official right, bribery and money laundering, two counts of interference with commerce by extortion under color of official right, one count of bribery concerning programs receiving federal funds, and three counts of money laundering.[2] There was significant pre-trial publicity about Anderson's case, but he did not seek a change of venue, and the court was able to seat a fair and impartial jury despite the pre-trial publicity. The crimes of which Anderson was convicted revolved around his dealings with a lobbyist named Bill Bobrick and a cooperating witness named Frank Prewit, who Anderson believed was representing a company which operated private prisons, Cornell Companies, Inc. Anderson's sentencing date is presently set for October 15, 2007. The charges against Kohring have nothing to do with Bobrick, Prewit or Cornell, but during the course of the Kott trial, which is discussed below, a connection between Anderson and individuals who will play a central role in the case against Kohring did emerge.

Kott and Weyhrauch were named in a single indictment. Count 1 charged them with conspiracy to commit extortion under color of official right, bribery, and honest services mail and wire fraud in violation of 18 U.S.C. § 371. Kott was also charged with interference with commerce by extortion induced under color of official right in violation of 18 U.S.C. § 1951(a), bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(b), and honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346. Weyhrauch faced similar charges, but his trial was separated from

_____

[1]Anderson and Weyhrauch did not run for re-election, and Kott was defeated in the last election preceding the return of the indictments.

[2]Case No. 3:06-cr-00099 JWS, *USA v. Anderson*.

Case 3:07-cr-00055-RRB   Document 86   Filed 10/09/07   Page 2 of 40

Kott's at the last minute when the United States appealed an order excluding certain evidence against Weyhrauch.

There was considerable pre-trial publicity about Kott and Weyhrauch, but neither sought a change of venue based on pre-trial publicity. The change of venue from Anchorage to Juneau, which Weyhrauch did seek, was based on an argument that the convenience of the defendant and witnesses, the location of events likely to be in issue, disruption to Weyhrauch's family and business, and the like warranted moving the trial.[3]

Central to the prosecution of Kohring, Kott, and Weyhrauch are two individuals with whom they allegedly conspired, Bill J. Allen and Richard F. Smith. Allen was an owner and the CEO of VECO Corporation, an oilfield services company. Smith was a VECO vice-president. Allen pled guilty to a conspiracy charge which parallels the conspiracy charges leveled at Kohring, Kott, and Weyhrauch.[4] Allen also pled guilty to bribing state officials and to a conspiracy to impede the Internal Revenue Service.[5] Smith pled guilty to the same crimes as those to which Allen pled guilty.[6]

Kott was convicted on September 25, 2007, after an eleven-day trial. During the course of the trial, Allen and Smith testified that Kohring was among the persons they bribed. That testimony was widely reported in the media. There was also testimony that Anderson had been bribed by VECO. Stories about the Kott trial appeared almost daily in the ADN, and there were frequent reports broadcast on television and radio. Some of them mentioned Kohring. Kott's sentencing has been scheduled for December 7, 2007, in Anchorage.

_____

[3]Case No. 3:07-cr-00056 JWS, *USA v. Kott and Weyhrauch*, doc. 73, at pp. 9-13. Weyhrauch's motion included an argument that because there was more extensive pre-trial publicity in Anchorage than in Juneau, it would take longer to seat a jury in Anchorage, but he expressly disavowed the notion that his motion was based on prejudicial pre-trial publicity under Rule 21. *Id.* at p. 13.

[4]Case No. 3:07-cr-057, *USA v. Allen*, doc. 5.

[5]*Id.*

[6]Case No. 3:07-cr-058, *USA v. Smith*, doc. 8.

The conspiracy charge common to the Allen, Smith, Kohring, Kott, and Weyhrauch cases revolves around the efforts of VECO to ensure enactment of a new oil tax regime in the state of Alaska at a tax rate favored by three of VECO's principal oil company customers and former Alaska Governor Frank Murkowski. The legislation, which came to be known as "PPT," was finally enacted during the last of three special legislative sessions called by Governor Murkowski in 2006 after the bill failed to pass during the regular session of the legislature in 2006. However, the legislature amended the bill backed by VECO, the oil companies, and Governor Murkowski by, among other things, increasing the tax rate.

As a result of the FBI's investigation into the actions of VECO, Allen, Smith, Kohring, Kott, and Weyhrauch relevant to passage of the PPT, Governor Murkowski's successor, Governor Sarah Palin, called a special session of the Alaska Legislature for late October 2007 to consider revisions to the PPT which, it has been suggested, may have taken a form less favorable to the State of Alaska than it would have taken were it not for the efforts of Allen, Smith, and their co-conspirators. The special session is scheduled to commence Thursday, October 18, 2007, in Juneau. Trial in the instant matter is scheduled to commence Monday, October 22, 2007.

Smith and Allen are both cooperating with the United States. Neither testified at the Anderson trial, but both testified against Kott. Their testimony has implicated other political figures. The testimony of Allen and Smith at the Kott trial indicated that those who were bribed included not just Kohring, Kott, Weyhrauch, and Anderson, but also former State Senate President Ben Stevens and State Senator John Cowdery, who is still in office. As a result of the testimony, Cowdery has elected not to participate in the special session of the legislature in October.

Allen's testimony at the Kott trial added to the public's information about an investigation of Alaska's senior United States Senator, Ted Stevens, who is Ben Stevens' father. The investigation of Ted Stevens first came into public view when the FBI executed a search warrant on his home in Girdwood, Alaska, apparently looking into the possibility that VECO had participated in a very substantial remodeling of the home. Allen's testimony at the Kott trial confirmed that VECO was involved in the

-4-

remodeling.  Smith's testimony at the Kott trial included testimony about an annual campaign fund-raiser known as the "Pig Roast" held at Allen's home in Anchorage to raise money for the election of Alaska's only Congressman, Don Young.  Smith testified that for many years he organized the Pig Roasts, for each of which he estimated VECO may have paid as much as $14,000 or $15,000.

## III.  STANDARD OF REVIEW

Kohring's motion is premised on the notion that prejudice among prospective jurors in this district must be presumed, because of extensive pre-trial publicity.  The legal test governing disposition of the instant motion is not disputed.  In *Daniels v. Woodford, t*he Ninth Circuit articulated the test in these words:

> Three factors should be considered in determining presumed prejudice: (1) whether there was a 'barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . .  wave of public passion'; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial.[7]

The Ninth Circuit has cautioned that prejudice is not lightly to be presumed: "Prejudice is presumed only in extreme instances 'when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime.'"[8]

## IV.  DISCUSSION

### A.  Illustrative Cases

Before evaluating the media materials relevant to Kohring's motion, it is useful to look at case law which gives context to the test which must be applied.  In *Irvin v.*

---

[7]*Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005) (quoting from *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998) *amended* 152 F.3d 1223).

[8]*Id.*

*Dowd*,[9] the Supreme Court concluded that a man convicted of murder had been denied a fair trial based on the extent and nature of pre-trial publicity in Gibson County, Indiana, where he was tried. The county was a rural county with a population of only about 30,000 people,[10] where 95% of the households were alleged to receive delivery of the newspapers which carried the printed pre-trial publicity.[11] The Court described the publicity as follows:

> [T]he awaited trial of petitioner had become the cause *celebre* of this small community–so much so that curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations. A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures were unleashed against him during the six or seven months preceding his trial. * * * These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson . . . , for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99 year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the modus operandi of these robberies was compared to that of the murders and the similarity noted). * * * [One] story characterized petitioner as remorseless and without conscience . . . . In many of the stories petitioner was described as the "confessed slayer of six" a parole violator and fraudulent-check artist. * * * On the day before the trial the newspapers carried the story that Irvin had orally admitted the murder of Kerr (the victim in this case) "as well as the robbery-murder of Mrs. Mary Holland, the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky."[12]

---

[9]366 U.S. 717 (1961).

[10]*Id.* at 366 U.S. 719.

[11]*Id.* at 366 U.S. 725

[12]*Id.* at 366 U.S. 725-26.

-6-

It is evident that the publicity was both extensive and concentrated on a small population. The publicity was unfairly prejudicial, for it was rife with information that would be inadmissible in trial. The publicity was highly inflammatory, because it was of the sort which would naturally evoke strong and lasting negative feelings about Irwin–he committed many other serious crimes, he went AWOL during the war, he was guilty of multiple murders, and he dragged his feet before confessing in an attempt to get a lesser punishment.

In *Daniels v. Woodford*,[13] the crime was the murder of two local police officers committed while they were attempting to arrest Daniels pursuant to a warrant relating to a bank robbery. The Ninth Circuit described the pre-trial publicity in the *Daniels* case as follows:

> The murders of Doty and Trust generated extensive and nearly continuous publicity immediately after the shootings and again before Daniel's trial. Articles described SWAT team searches of the neighborhood where Daniels was hiding.
>
> News accounts described the perpetrator as a Black paraplegic, and Daniels was identified as the killer from the very beginning.
>
> * * * Three months before the trial, news articles covered the local school board's proposal to rename its football stadium in honor of officer Doty. One month before Daniel's trial was to begin, on the anniversary of the killings, a statue commemorating fallen police officers was unveiled by the county. The publicity surrounding the memorial and its unveiling ceremony largely referred to officers Trust and Doty. The memorial statute, standing nine feet tall, was located across the street from the Riverside County courthouse where Daniels was tried.
>
> Based on our review of the California Supreme Court's findings, the public's response to this publicity clearly amounted to a "huge" wave of public passion. As the California Supreme Court described it, police stations were "deluged" with calls from citizens offering tips on the investigation and offering to establish a memorial fund. In addition, local newspapers printed numerous letters from readers calling for Daniels's execution. The officers were turned into "posthumous celebrities," and approximately three thousand people attended their funerals. That the

_____

[13]428 F. 3d 1181 (9th Cir. 2005).

-7-

news coverage saturated the county is reflected in the fact that eighty-seven percent of the jury pool recognized the case from the media coverage. * * *

The press accounts did not merely relate factual details, but included editorials and letters to the editor calling for Daniels's execution. In addition, news articles reflected the prosecution's theory of the case by attributing the killings to Daniels's desire to escape justice. Also well-publicized by the press was Daniels's past criminal offenses, including an arrest for shooting at a police officer. Such information was highly prejudicial and would not have been admissible at the guilt phase of Daniels's trial.[14]

In *Daniels*, as in *Irwin*, the pre-trial publicity was of a sort which was both unfairly prejudicial and, for a variety of reasons, likely to invoke strong and lasting impressions of the defendant–he was a cop killer, he was hunted by a SWAT team, one of the men he killed was such an outstanding police officer that his name warranted special public recognition.

*Harris v. Pulley*,[15] involved a *habeas* petitioner who had been convicted in state court on two counts of murder and sentenced to death. Affirming the district court, the Ninth Circuit rejected a claim that prejudice should be presumed on the basis of pre-trial publicity. The Ninth Circuit described the pre-trial publicity as follows:

Pervasive media coverage of Harris and his crimes started with his televised capture for bank robbery. The pretrial publicity apparently included stories that Harris and his brother had confessed to the crimes, that Harris had previously been convicted of manslaughter and that Harris had violated his parole. Numerous editorials and letters to the editor called for the death penalty and a television poll overwhelmingly showed that viewers supported the death penalty in this case. Even the battle between the U.S. Attorney's and District Attorney's offices concerning who would have the first opportunity to prosecute Harris received extensive coverage by the local media for over two weeks.[16]

---

[14]*Daniels*, 428 F.3d at 1211-12 (citations omitted).

[15]885 F.2d 1354 (9th Cir. 1998).

[16]*Harris*, 885 F.2d at 1360 (quoting from *Harris v. Pulley*, 692 F.2d 1189, 1199 (9th Cir. 1982)).

Case 3:07-cr-00055-RRB   Document 86   Filed 10/09/07   Page 8 of 40

The Court of Appeals noted that the accounts of Harris' prior criminal record and alleged confession were published within two weeks of the date of the murders on July 5, 1978, and that the accounts of the inter-office rivalry ran for two and a half weeks ending on August 20, 1978. It concluded that the publicity had dissipated considerably by the time jury selection began a few months after the murders. The *Harris* court reviewed all the pre-trial publicity and concluded that it was largely of a factual nature, noting that even the inter-office rivalry between prosecutors focused mostly on the merits of the competing systems of criminal justice and did not report any pre-trial judgment of Harris' guilt by either office. *Harris* suggests that when pre-trial publicity is mainly factual, publication of editorials and letters to the editor asserting a need to impose the ultimate punishment on a defendant whose confession was reported in the media do not require a finding of presumed prejudice, at least when the publicity had diminished in the weeks before trial.

In *Ainsworth v. Calderon,*[17] the Ninth Circuit confronted another death row resident's petition for a writ of *habeas corpus.* The case arose out of a horrific crime in which Ainsworth shot a woman through the hips and pelvis, stuffed her in a car trunk, then moved her to the back seat and raped her. Eventually her corpse was dumped in a wooded area. Ainsworth's co-defendant was arrested and confessed. The pre-trial publicity was, with the exception of a single article, all published months before the trial commenced. The appellate court found the reporting to be mostly factual in nature, and observed that to the extent any reporting was prejudicial because it portrayed the victim as sympathetic or disclosed Ainsworth's criminal record, it was printed several months before trial. No editorials or opinion pieces speculating about Ainsworth's guilt were disclosed. In these circumstances, the *Ainsworth* court concluded that prejudice should not be presumed. Like *Harris,* this case indicates that the passage of time between inflammatory publicity and the trial date is an important consideration.

---

[17]138 F.3d 787 (9th Cir. 1998).

Case 3:07-cr-00055-RRB   Document 86   Filed 10/09/07   Page 9 of 40

In *United States v. Sherwood*[18] the Ninth Circuit addressed a situation in which the particular event underlying the prosecution–kidnapping the daughter of a well-known figure in Las Vegas--was so widely known that during *voir dire* 96% of the prospective jurors stated they were aware of the case. Nevertheless, the appellate court held that there was neither presumed nor actual prejudice. Concerning the fact that knowledge of the case was widespread, the court wrote:

> Although a defendant is entitled to an impartial jury, he is not entitled to a jury completely ignorant of the facts. *United States v. Flores-Elias*, 650 F.2d 1149 (9th Cir. 1981); *see also United States v. Bailleaux*, 685 F.2d 1105, 1108 (9th Cir. 1982) ("It is not all publicity that causes prejudice to a defendant, but only that publicity that operates to deprive the defendant of a fair trial.").[19]

Publicity directed in significant part to other members of a conspiracy charged against the defendants on trial was considered in *United States v. Croft.*[20] There, the Ninth Circuit addressed the presumed prejudice claim of Sally-Anne Croft and Susan Hagan, two high-ranking followers of an Indian mystic named Bhagwan Shree Rajneesh who were charged with conspiring to murder the United States Attorney for the District of Oregon. Five of their alleged co-conspirators agreed to cooperate with the United States. They testified at trial against Croft and Hagan. Rajneesh had founded a spiritual community in central Oregon called Rajneeshpuram. Evidence presented by defendants showed that "huge numbers of (largely negative) stories had appeared in local Oregon media since 1981 concerning Rajneesh and his followers, and [there were] opinion polls conducted in 1984, 1992, and 1994 indicating that 90% of Oregonians knew about Rajneeshpuram, over 60% had heard of [Croft and Hagan's] prosecution, and over 40% believed that the indicted conspirators were guilty of the conspiracy."[21] In rejecting the defendants' claim of presumed prejudice, the appellate court pointed out

---

[18]98 F.3d 402 (9th Cir. 1996),

[19]*Id.* at 98 F.3d 410.

[20]124 F. 3d 1109 (9th Cir. 1997).

[21]*Id.* at 124 F.3d 1115.

Case 3:07-cr-00055-RRB   Document 86   Filed 10/09/07   Page 10 of 40

that most of the publicity was dated by the time of the trial but went on to discuss additional considerations:

> Most of those stories were not directed at Croft and Hagan, but at Sheela, Rajneesh, and the Rajneesh community as a whole. The adverse opinions reported in the 1992 and 1994 polls were directed at all of the indicted co-conspirators, five of whom were government witnesses, and not specifically at Croft and Hagan. The most recent articles about the charges were factual and not inflammatory. The district court was not required to presume prejudice.[22]

*Croft*, then, instructs that the publicity of central concern is the publicity about the person on trial. Publicity about other participants in a charged conspiracy is not as significant. *Croft* also reinforces the proposition recognized in *Sherwood* that a large volume of publicity alone is not enough to require a change of venue.

## B. Significant Media

### 1. Newspapers

Kohring attached copies of a number of items clipped from newspapers to support his motion.[23] Most are stories from the Anchorage Daily News ("ADN"), the only daily newspaper in Anchorage. ADN is also the only daily newspaper in Alaska which has significant circulation outside the city in which it is published. Anchorage is the largest city in Alaska and a very high percentage of petit jurors seated for trials in federal court in Anchorage reside in Anchorage. The other newspaper from which Kohring has presented information is the Frontiersman. Published in Wasilla, the Frontiersman circulates in Wasilla and nearby Palmer. It is not distributed in Anchorage, or other towns from which Anchorage petit jurors are drawn such as Cordova, Seward, Kenai, Soldotna, Homer, Kodiak, Bethel, Naknek, Dillingham, and Cold Bay. Both the ADN and the Frontiersman maintain sites on the internet which are likely visited by some people who reside outside areas where the paper version is distributed.

---

[22] *Id.*

[23] The material consisting of exhibits to the motion at docket 36 is designated docket 36-2 in the court's ECF system, which is also identified as Exhibit A to docket 36.

The first item among the materials filed with the motion is a story from the first page of the B section of the ADN.[24]  Published on July 13, 2007, the article's subject is the effort then underway to find a replacement for Kohring following his announcement that he would resign from the Alaska Legislature.  The article focuses on political considerations involved in the governor's selection of a replacement.  Its theme is that the governor seeks a person who will be independent and won't automatically align with a particular political party.  What little is said in the article about Kohring is a straightforward report that he faces federal bribery and extortion charges and has decided to leave his office to concentrate on defending himself.  As the newspaper correctly notes on the front page portion of the article, "Kohring maintains that he is innocent."  There is nothing in the article to suggest that Kohring is guilty of any crime.

The next ADN article[25] provided by Kohring is a June 1, 2007 story, also from the B section of the paper, which reports that the speaker of the Alaska House of Representatives and the majority leader anticipate that Kohring will resign his seat in the House based on their talks with Kohring.  The story explicitly recites that Kohring pled not guilty, and reports that Kohring has repeatedly pointed out that he should be presumed innocent.  Kohring is quoted as saying, "If I were to resign, it's not an admission of guilt; it's primarily because I've got to focus on this trial."  Like the article discussed above, this one is factual and contains no inflammatory commentary.

An article from July 18, 2007, reporting Governor Palin's selection of Wes Keller to replace Kohring is the next item.[26]  This ADN story which appeared on the first page of the B section is primarily about Kohring's successor.  It does report that Kohring resigned after being indicted, and that Kohring "says he is innocent."  Kohring did not provide the continuation page, but what he has provided is factual and presents nothing prejudicial.  Another story on the same page is headlined "Weyhrauch wants trial relocated to Juneau."  Kohring did not provide the text for that article.

---

[24]Doc. 36-2 at pp. 2-3.

[25]*Id.* at pp. 5-6.

[26]*Id.* at 8.

-12-

The next item from the ADN is the July 22, 2007 edition of a weekly gossip/humor column written by Sheila Toomey entitled the "Alaska Ear."[27]  Of pertinence here is the following:

> VRF (very recently former) Valley Rep. Vic Kohring is mightily annoyed at Ear for teasing him about his highway sign waving.  And for the joke about the smoke over the valley being from the Kenai fire, not Vic burning evidence.  "I'm concerned that your remarks are maligning me." Vic wrote. "Of greater concern is the potential such comments may taint the jury pool as it pertains to my upcoming federal trial, where those who will decide my fate in court are being negatively influenced."  Federal juries are drawn statewide and are unlikely to be influenced by Ear.  But it seems only fair to pass along his objections about Ear in his own words.  To read the entire letter, go to (the website).[28]

The column is not intended to be a factual account of events.  Indeed, the gossip/humor columnist in question is known for a phrase which sometimes appears in her column, "The truth can be so limiting."  While Ms. Toomey may be a bit too humble about the potential impact of her writing on public perception, it is unlikely that a significant number of readers would accept what is published in "the Ear" seriously enough to affect their judgment about something of so much consequence as resolution of the pending charges.

The next item, an article from the newspaper's B section, was published on June 18, 2007.[29]  It reports that Kohring may delay announcement of his decision on possible resignation.  According to the story, Kohring had sinus surgery and his medical condition might not permit him to attend the Wasilla Chamber of Commerce meeting the next day at which he had said he would announce his decision.  Only a portion of the article has been reproduced, but there is nothing in the reproduced segment which is inflammatory.

---

[27] *Id.* at p. 9

[28] *Id.*

[29] *Id.* at p. 10.

-13-

Kohring has also provided the continuation page of a story which apparently appeared on the front page of ADN on June 20, 2007.[30]  The portion of the story on the front page was not provided.  The portion of the story which defendant has provided recounts what happened when Kohring announced his decision to resign at a city council meeting in Wasilla.  According to the story, when Kohring announced his decision, about a third of the people stood and clapped, while the others remained seated.  The story also indicates that outside the building there were protestors carrying negative signs saying "Recall Vic," and "Do the right thing," as well as a few of Kohring's supporters, one of whom held a sign reading "We Like Vic."  Beneath the article, there is a time-line which reports some of the events charged in the indictment against Kohring as well as some of the events relating to passage of the PPT.  A picture of Kohring appears next to the time-line.  The text which accompanies the photo reads: "Kohring arrives at the Wasilla Chamber of Commerce meeting Tuesday.  Kohring, who had asked constituents to weigh in on whether he should quit, said responses ran about 60 percent in favor of his keeping his seat in the Legislature.  He said he'd decided, though, he needed to devote his full time to fighting his federal indictment."  These materials are factual; the newspaper was simply reporting things as they occurred.  This article was published four months prior to the scheduled trial date.

The next item is a double story from the front page of the May 5, 2007 edition of the ADN running under the headline "Feds Charge 3 in Juneau."[31]  Above the headline appear photos of Kott, Weyhrauch, and Kohring, each accompanied by notation of the legislative position held and a summary of the crimes charged.  In Kohring's case the notation reads "Wasilla Republican elected to House in 1994" and "Accused of receiving cash payments, loan from Veco, a job for a relative."  The story on the left side of the page reports in a sub-headline that Kohring, Kott, and Weyhrauch have all pled not

---

[30]Doc. 36-2 at pp. 11-12.  The publication date is cut off, but counsel labeled it "ADN (6-20-07)" and the first line says "Continued from A-1," a reference to the front page in the terminology used by ADN.  The excerpt is on both pages 11 and 12 of the attachment in order to display all of the text, time-line, and photos clearly.

[31]Doc. 36-2 at pp. 13-14.

-14-

guilty.  The story on the right reports that the "rumor mill" in Juneau was running wild as the defendants stood handcuffed in federal court.  Kohring has not provided the continuation page, but what is provided appears to be factual reporting unlikely to elicit an outbreak of "public passion."

Kohring also provided a copy of news stories which appeared in the Frontiersman, a newspaper which circulates in Wasilla, but not in Anchorage.  The story is the lead story from the Frontiersman's front page on May 6, 2007.[32]  The portion of the story on the front page reports that Kohring has been charged with extortion and bribery and has turned himself in to authorities in Juneau, where he was arrested one day after Kott and Weyhrauch had been arrested.  The continuation page reports some of the details in the indictment, including a boast by a VECO executive that he had "given Kohring $1,000 and, as a result, Kohring would 'kiss our ass.'"  The story goes on to report that Kohring was taken into court in handcuffs and that he pled not guilty.  The story quotes from a press release as follows:  "Mr. Kohring intends to vigorously fight the allegations contained in the indictment and expects that he will be vindicated.  It is important to remember that Mr. Kohring is, in accordance with our Constitution, innocent until proven guilty."  The story reported that Kohring was cooperating with authorities and then goes on to discuss how a replacement might be selected if Kohring should decide to resign.  This story is factual.  It does contain a colorful quote from the VECO executive, but even that appears to be a factual report and something that likely will be presented as part of the wiretap evidence at trial.

Next, Kohring supplies copies of a series of editorial cartoons, letters to the editor, and opinion pieces published in May and June of 2007, and a single column published on July 24, 2007.[33]  Most of the editorial cartoons are from the Frontiersman.  The first of the Frontiersman cartoons was published on May 6, 2007–well over five months prior to the October 22 trial date–and is the nastiest of the lot.  In it, a character labeled "Kohring" is shown staring between bars on a window in the rear door of a van

---

[32]*Id.* at pp. 4 (front page) and 7 (continuation page)

[33]Doc. 36-3.  (Exhibit B to docket 36).

-15-

labeled "FBI," saying, "I guess it all depends on what your definition of slimy low-life embezzler is."[34]  It should be noted that the cartoon appears on the same page as a column by Ray Metcalfe, in which he discusses the proposition that some two dozen legislators received financial support from VECO and that Alaska is not receiving its fair share of revenue from oil production when compared to the share received by other governments.  This cartoon, particularly when printed in association with the column, is intended, and likely, to elicit negative feelings about Kohring.

The next cartoon is from the May 13, 2007, edition of the Frontiersman.[35]  The cartoon depicts Kohring as one of three piglets peering over the back of a sow in which the sow says "Filthy" and the piglets exclaim, "Not Filthy."  This cartoon has a strongly negative connotation seemingly intended and likely to incite ill will toward Kohring.

The next Frontiersman cartoon appeared on June 10, 2007.[36]  It depicts Governor Sarah Palin as Dorothy in the "Wizard of Oz" standing in front of a sign reading "special session" which points to a castle in the distance.  In the cartoon, she says to Kohring, who appears as an animal that resembles a skunk, "Aren't you supposed to be lion?"  This cartoon is also prejudicial to Kohring and ties his behavior to the need for a special session of the legislature.

The last Frontiersman cartoon was published on June 17, 2007.[37]  In it, Kohring is depicted as the driver of a motor home which has just plunged off cliff, musing, "I just can't decide if I should set the parking brake."  This is a clear reference to Kohring's vacillation about his resignation from the legislature.  This cartoon does little more than elicit a chuckle over Kohring's indecisive behavior, albeit true that the occasion for his indecision is the indictment against him.

The Frontiersman cartoons appear mean-spirited and capable of arousing ill-will toward Kohring.  They clearly imply that he is guilty.  One of them ties his alleged

---

[34]*Id.* at p. 2.

[35]*Id.* at p. 3.

[36]*Id.* at p. 5.

[37]*Id.* at p. 4.

behavior to the upcoming special legislative session, which might incite additional ill will. The significance of these cartoons is greatly diminished by their temporal separation from the trial date and, perhaps, even more so by the fact that they appeared in the Frontiersman, a small newspaper which circulates in Wasilla and Palmer, but not in Anchorage or communities elsewhere within the area from which petit juries are drawn for service in Anchorage (*e.g.,* Cordova, Seward, Kenai, Soldotna, Homer, Kodiak, Dillingham, and Cold Bay).

Kohring has provided cartoons and editorial material from the ADN also. The first item is a cartoon from the May 10, 2007 edition. Kohring stands in the foreground and a person in the background says to another, "Here's a scary thought, maybe he DOES represent his district."[38] This cartoon is as much a dig at the people who elected Kohring as it is at the defendant. Its publication more than five months prior to the trial date renders it of little or no significance for purposes of establishing "presumed" prejudice. The second ADN cartoon is taken from the May 17, 2007 paper. It pokes fun at politicians depositing campaign funds from VECO. It does not mention Kohring.

The next item is an almost entirely illegible opinion piece by ADN writer Michael Carey which, due to the poor quality of reproduction, was withdrawn by Kohring.[39] The next item which can be considered is an editorial comment running next to a cartoon depicting Bill Allen in the May 13, 2007 edition of the ADN. There, the editors write about Kohring: "Innocent until proven guilty? Absolutely. But any lawmaker indicted for selling his votes is too compromised to serve his constituents. The honorable thing to do is resign."[40] This comment is an opinion, to be sure, but it is not inflammatory and tends to reinforce the presumption of innocence.

---

[38]*Id.* at p. 6 (emphasis on "does" in original).

[39]The column is at doc. 36-3, p. 8. Kohring's motion to withdraw the document is at docket 55, and the order granting his request is at docket 60.

[40]Doc. 36-3 at p. 9. The quote seemed to be a repetition by the newspaper of an editorial comment first made on May 2.

-17-

Two letters to the editor printed on May 11, 2007, in the ADN are highlighted next.[41]  One from a man in Palmer asserts that Kohring should have a new campaign sign reading, "Vic Kohring–Hardworking, Conservative, Corrupt."  The author of the other letter highlighted by Kohring indicates that he and others prostituted themselves for a few thousand dollars, that Kohring became a "petty, sleazy influence peddler," and that Kohring and the others involved are held in contempt by the letter writer.  This is nasty stuff, but two letters to the editor written more than five months before trial are of little significance.

Next, Kohring provides a cartoon from the May 8, 2007 edition of ADN depicting Bill Allen holding up a t-shirt on which has been stenciled, "Corrupting Bastards Club."[42]  This is a reference to some VECO baseball caps on which the initials "CBC," standing for Corrupt Bastards Club, had been monogrammed.  The hats were the subject of some interest following the FBI searches conducted earlier.  Testimony at the Kott trail established that the hats were meant as a joke and that there was no "club."  In any event, the cartoon does emphasize the stain of corruption spread by Allen.  Having been published on May 8, 2007, it is hard to imagine that this cartoon could have any impact by the time trial starts on October 22, 2007.

The final opinion piece offered is a column published on September 24, 2007, in the ADN by well-known Alaskan author John Strohmeyer.[43]  Kohring is not mentioned by name in the article, whose theme seems to be to place the current FBI investigation into a longer historical context involving corruption associated with the large sums of money generated by oil production in Alaska.  While the writer concludes that the FBI investigations could produce results of historic consequence, the column is not something which would likely generate ill-will focused on Kohring.

The newspaper publications did not cease on the date that the motion to change venue was filed.  Indeed, there were many more stories in the ADN as Kott's trial

---

[41]*Id.* at p. 10.

[42]*Id.* at p. 11.

[43]*Id.* at p. 12.

-18-

approached. This court presided in Kott's case, and so paid close attention to the numerous media reports which appeared prior to jury selection and during Kott's trial. There were front page stories about the trial frequently as the trial date approached and nearly every day of its two-week duration. The ADN stories just prior to and during the Kott trial did not differ in tenor from those supplied with Kohring's original motion papers. Like the news stories in the ADN and Frontiersman discussed above, these more recent stories were factual, not inflammatory. One story published on September 28, 2007, in the ADN relating to Kohring's efforts to suppress statements he made to the FBI is of some concern. That story is discussed in some detail below where the on-line copy of the article, which was supplied by Kohring in a supplemental filing, is addressed.

The Kott jury convicted him on three counts and acquitted him on the fourth count in verdicts which were returned on September 25, 2007. Kohring filed a motion to supplement the materials supporting his motion to change venue on September 28, 2007.[44] The additional media materials accompanied the notice of supplemental materials also filed on September 28, 2007.[45] In this instance, the provided newspaper accounts come from the on-line websites maintained by ADN, ADN.com; the Juneau Empire, JuneauEmpire.com; and the Frontiersman, Frontiersman.com, rather than from the print editions (discussed generally as to ADN in the preceding paragraph). The media materials also include items from three television station websites. They are discussed in the next section of this order.

The first item in the supplement is from ADN.com on September 26, 2007, the day after the Kott verdicts were returned.[46] The item is basically a compilation of comments from several sources. It opens with a quote from Governor Palin saying she was shocked by the revelations at trial, and indicating that she understands why

---

[44]Doc. 74. The court granted the motion to supplement in an order at docket 75 which provided that the United States might file a further response, but it elected not to do so.

[45]The notice is at docket 73. Some of the Exhibits were large enough to be filed in multiple documents. The result is that the new exhibits which were designated Exhibits D thru F by Kohring are identified on ECF as docket numbers 73-3 thru 73-13.

[46]Doc. 73-3 at pp. 2-3.

-19-

Alaskans would feel betrayed.  The next quote is from State Senator Dyson who said his heart goes out to the Kott family, but what "these guys" did is highly offensive.  The next quote is from Kohring's lawyer and bears repeating in its entirety: "Mr. Kott said some very unfortunate things on tape, and he voted for Veco's interests.  My client, Mr. Kohring, didn't say unfortunate things on tape, never swore–doesn't swear, doesn't drink–and didn't vote for Veco's interests.  So that's the difference."  The next comment is attributed to Professor Steve Haycox, who suggests that in terms of cleaning up Alaska politics, it was Governor Palin's election which was the earthquake and equating things like Kott's conviction with aftershocks.  Other comments come from persons less well known and generally encourage the FBI to keep up its work and imply that Senator Stevens and Representative Young may be implicated.  This item does not indicate that Kohring himself is guilty of any offense, and the quote from his lawyer points to important differences between the evidence against Kott and Kohring's situation.

Next, Kohring offers a story from ADN.com posted on September 26, 2007.[47] The focus of the story is on the absence of significant state involvement in the effort to weed out official corruption.  It mentions Kott's conviction and that Kohring's trial will be next.  The story also recounts Attorney General Talis Colberg's comments on the limited role his office can play.  Some views are also expressed by State House Representatives Gara and Crawford, who are urging action by the Alaska Public Offices Commission ("APOC") with respect to VECO's campaign contributions in general.  The article does not focus on Kohring.

The next item is also from ADN.com.[48]  It includes a brief summary of the verdicts against Kott and gives an estimate of Kott's sentencing exposure, the date of Anderson's sentencing, and the date of Kohring's trial, and mentions that Weyhrauch's trial has been put off.  Comments from some readers follow.  They are not directly connected to the summary provided by the publisher and do not mention Kohring by name.

---

[47]*Id.* at pp. 5-6.

[48]*Id.* at pp. 6-7.

A story which summarizes Kott's trial testimony and includes some of the recorded evidence is on offer next.[49] Kott's testimony does not mention Kohring, but in one passage from a tape recorded conversation, in which it is pointed out that many legislators, including Representatives Ramras (not indicted on any charges), Foster (not indicted on any charges), Kohring, and Anderson, are believed by Kott to be supportive of the "20/20" tax/credit rates desired by Governor Murkowski and the oil producers. The story is not inflammatory. Comments made by readers follow. They relate primarily to Kott, although one also references a woman named Linehan who was on trial for murder in State Court. Nothing in the story or the comments contains anything inflammatory about Kohring.

The next in the sequence as provided by Kohring is an ADN.com item from September 18, 2007.[50] It touches upon numerous topics. The only reference to Kohring is the following: "Former Rep. Vic Kohring's lawyer continues to pursue attempts to get charges of bribery and extortion against his client dismissed." That item is followed by a potpourri of short stories posted on ADN.com on September 17, 2007.[51] An update on the Kott trial runs beneath a story about the migration of the godwit, a bird that can fly non-stop from Alaska to New Zealand. The story about Kott then segues into a story about efforts Kohring's attorney is making to obtain an inquiry into whether the Department of Justice put undue pressure on Kohring to try to persuade him to plead guilty. It then mentions that Anderson and Prewit may have recorded conversations with Kohring, but does not give any indication about what might have been recorded. There is nothing in this posting which would tend to inflame passions against Kohring.

The next item is also from ADN.com. It is a story from September 16, 2007, which runs beneath the headline, "Alaska corruption prosecutors criticized." The story recounts Kohring's assertion that the FBI used another state legislator to pressure him

---

[49]*Id.* at pp. 8-10.

[50]*Id.* at p. 12.

[51]*Id.* at pp. 13-14.

-21-

to plead guilty at a time after Kohring had retained counsel.  The article quotes Kohring's counsel, John Henry Browne, "Here we have someone who is a lapdog for the government [State Representative Fred Dyson] encouraging me and Vic not to exercise our right to trial."  The article goes on to report that Browne plans to try to get the charges against Kohring dismissed based on Dyson's actions.  It includes some rebuttal by Dyson saying he was advising Kohring to avoid stress by talking to "the feds" about "an attractive alternative."  Details were not given.  The article does not make any assessment or draw any inference.  It simply reports things that happened.  None of this material seems likely to generate inflamed feelings about Kohring.  If anyone comes out looking a little bad in the story, it is Mr. Dyson.

Next there follows a series of articles from the ADN.com site which the court has reviewed.[52]  Interspersed among them are comments from readers.  All of the stories are factual in nature and not inflammatory.  The comments tend to focus on United States Senator Ted Stevens, former State Senator Ben Stevens, and VECO.  With respect to Kohring, himself, very little is said.  One detail concerning Kohring in these materials appears in a story published September 13, 2007, reporting that Bill Allen testified that he bribed three legislators, Pete Kott, Ben Stevens, and Vic Kohring.[53]  In another story also published on September 13, 2007,[54] Allen testified that he gave Kohring $1,000 for two reasons.  First, he felt sorry for Kohring who was financially strapped and second, he appreciated Kohring's votes.  No conclusion is drawn in either story about the credibility of Allen's testimony.   Like the other stories in this series, these stories are factual in nature.  The United States has said that Allen will testify at Kohring's trial.[55]  Allen can be expected to say essentially the same things at Kohring's trial where he will be subject to cross-examination by Kohring's lawyer.  These stories appeared almost six weeks prior to the date Kohring's trial will commence.   The court

[52]Doc. 73-4 at pp. 1-18 and 73-5 at pp. 75-17.

[53]Doc. 73-4 at p. 16.

[54]Doc. 73-5 at p. 5.

[55]Doc. 82.

finds nothing in these materials which supports moving the trial to the Western District of Washington.

The next set of materials provided by Kohring consists of material from the Juneau Empire's website, nearly all of which are very similar to the ADN.com stories and/or ADN print stories the court has already discussed. [56]  The court has also reviewed these materials and again concludes that all of the stories are factual in nature.  Moreover, the Juneau Empire is not a newspaper frequently read by Anchorage jurors.  Indeed, in individualized questioning about pre-trial publicity in both the Anderson and Kott cases, which involved a total of about 220 people who reside in the area from which Anchorage petit jurors are summoned, this court cannot recall a single person stating that he or she got any of his local news information from the Juneau Empire.

The next item is a cartoon published in the ADN on August 8, 2007.[57]  It pokes fun at the prospect that the legislation emerging from the upcoming special session may be subject to improper influence.  Kohring is not mentioned in the cartoon.  Although a reminder that in theory Kohring could be made one of the scapegoats for the tortuous path of the oil tax legislation, the fact that he is not mentioned underscores that it is pure speculation to say that Kohring will be cast in that role by the media in the future.

The next group of materials is taken from the Juneau Empire website, with a number being further identified as coming from Juneau Blogger.com, which appears to be something posted in association with the Juneau Empire.[58]  One of the items is an opinion piece by Governor Palin explaining the new oil tax legislation she plans to present to a special session of the legislature.[59]  She explains that the reason new legislation is needed is that the existing PPT law is not working as it was intended.  She says nothing to suggest that the new law is needed because the existing PPT is the

---

[56]Doc. 73-6 through doc. 73-7 at p. 8.

[57]Doc. 73-11 at p. 1.

[58]Doc. 73-11 pp. 2 thru 7.

[59]*Id.* at pp. 2-4.

result of corruption. She does not mention Kohring (nor, for that matter, does she mention Kott or Anderson). The next item is a Juneau Empire editorial calling for revitalization and improvement in the APOC.[60] The editorial mentions in passing that Allen testified he bribed Kott, Ben Stevens, and Kohring. That is hardly the focal point of the editorial which is essentially a call for reform of the enforcement of campaign financing. Another is an opinion piece by Rick Moniak,[61] which takes off from a brief summary of the public corruption issues of the day, then harkens back to Plato's "Republic" and calls for reform in Alaska and in the nation. This is not something that is inflammatory or could raise a public passion against Kohring.

The next item presented is from a website named "Vox Box."[62] It appears that the website posed this question as a result of Kohring's request to move his trial to Juneau: "Can indicted former lawmakers receive a fair trial in Alaska." It appears 12 responses were received and they are provided following the question. Response number 1 says simply, "Of course they can." Response number 2 muses that Kohring's request is like a child saying, "Can I go to Granma's because you guys aren't being fair." The writer of that response goes on to intimate the view that Kohring is guilty and should just cooperate with the government. The third responder opines that it will be the evidence, not the place of trial that will determine the outcome. Responder 4 clearly implies that Kohring is corrupt, saying that a jury of his peers would be politicians on the take. Response 5 is turgid, but seems to make the point that Kohring should understand the legal process. Response 6 indicates the government has already tried the case in the press and the jury pool is tainted. Response 7 is from Bob, who thinks the outcome would be the same in Washington as in Alaska. Response 8 is from Dave, who agrees with Bob, but goes on rather darkly to suggest that the trial could be in China for all he cares, but then there should be a "Chinese style sentence." Response 9 is from someone talking about an entirely different case or cases. Those

---

[60] *Id.* at pp. 5-6.

[61] *Id.* at pp. 6-7.

[62] *Id.* at pp. 8-10.

who wrote responses 10, 11, and 12 seem to be venting political frustrations, but not involving Kohring. It is worth emphasizing that the first response is dated August 30, 2007, and the last is dated September 13, 2007, a fact which strongly suggests that almost nobody visits the website, that almost nobody was interested in the question, or both. This smattering of anonymous chatter of is no significance.

Next come three newspaper items from the Frontiersman. The first is from that paper's website. It is a letter calling for United States Senator Ted Stevens to resign.[63] It is based exclusively on news relating to Stevens and has nothing to do with Kohring. The next item is a cartoon published in the Frontiersman on September 2, 2007. It depicts Kohring crouched in front of three dark figures with FBI badges saying, "If you can't say something nice about someone, you shouldn't be allowed to enter it as evidence." This appeared about seven weeks before trial in a paper that has limited circulation in the area from which the court's jurors are drawn. The final item is another Frontiersman cartoon, this one published even earlier, on August 28, 2007. It pokes fun at the fact that the PPT is now said by some to have fallen well short of expected revenue projections. Kohring is not referenced in the cartoon.

Next, Kohring points to an ADN.com story published on September 28, 2007, reporting on the efforts of Kohring's lawyer to suppress evidence in his case.[64] This is the on-line copy of the newsprint version identified by the court above as the one story that in itself is of some concern. The evidence in question consists of what Kohring told the FBI: He had asked for money from Smith and Allen; he asked Smith about borrowing or renting a truck; he dined regularly with lobbyists and liked the free meals, he had a $2,700 per month consulting contract for developer Mark Marlow involving duties he could not describe; and he secured a job for his nephew at VECO by asking Allen for it. If the evidence is excluded, a prospective juror who remembered the story would have to be able to set it aside or be excused by the court. The story includes Browne's assertion that all the allegations can be explained and most importantly, that

---

[63]*Id.* at pp. 11-12.

[64]Doc. 73-12 at pp. 2-3.

Kohring did not actually vote the VECO line in the legislature. Despite the addition of Browne's comment which provides an overall balance to the story, it could be the source of unfair prejudice against Kohring. This story is not, however, the stuff of which a "huge wave of public passion" can be made. Rather, it is exactly the sort of thing whose potential influence can be weeded out during *voir dire.*

Next, Kohring presents three comments sent to ADN.com.[65] One refers to Kohring as a "patsy" being manipulated by others. A second seems to take Kohring's side in recognizing that the federal government is a formidable adversary that may trick people. The third criticizes Kohring's attorney for referring to Dyson as a "lapdog." These comments do not evidence a wave of public passion against Kohring.

An on-line display of the Alaska Ear gossip column, which was published September 9, 2007, is the next item presented by Kohring.[66] Appearing near the middle of the document is a report that someone, apparently Kohring's parents, circulated a letter asking for contributions to the "Vic Kohring Legal Defense Fund." The columnist wonders who might have received the letter and describes its contents: "Vic strongly denies federal charges of bribery, it says, and his lawyer believes the feds will have a tough time 'proving wrong-doing.'" After noting the letter estimates Kohring's legal costs to be $250,000, the columnist then responds to her own question about the letter's addresses: "As to the mailing list, the only recipients Ear has heard about are lobbyists, but no Ear travels in questionable circles." Thus, the column does make an association between those who might defend Kohring and people of questionable character. Given that the column also points out that Kohring is vigorously defending against the charges, and at considerable cost, any tendency the column might have to inflame its readers against Kohring is blunted.

The next item is from the September 4, 2007, print version of the ADN.[67] It contains a box which lists "What's hot at adn.com." Kohring draws attention to two of

---

[65]*Id.* at p. 4.

[66]*Id.* at pp. 5-6.

[67]*Id.* at p. 7.

the five "most e-mailed items." Both relate to Governor Palin. One addresses her agenda for oil tax legislation, and one addresses her prediction for positive changes in politics. Unless these are articles not presented to the court by Kohring, or read by the court on its own, neither contains anything inflammatory about Kohring. It is also worth noting that these two stories ranked as fourth and fifth behind stories about a "perfect wedding," an 87.7 pound cabbage, and an 88-year-old motorist who was killed when he struck a moose.

Next, Kohring provides a piece from ADN.com which discusses the idea for voter initiatives at the federal level, akin to those allowed in many states, espoused by Mike Gravel.[68] Gravel is a former United States Senator from Alaska who is campaigning for the Democratic presidential nomination. The story mentions nothing about Kohring, or anyone connected to has case. Why it has been provided for the court's consideration is unclear.

The next item is a "Who's up, who's down" commentary from ADN.[69] It lists various persons, things, and events and offers an opinion about whether their fortunes are up or down. A local dairy, a drunk driver from Fairbanks, bears frequenting a popular fishing location, and those hoping to catch silver salmon in Southcentral Alaska are all rated as down. People attending the Alaska State Fair are ranked up, based on unseasonably nice weather. The only neutral ranking is "Vic Kohring: Indicted former rep has a defense! Says FBI didn't read him his rights and was mean to him. He'll get a chance to tell it to the judge." This lone entry buried in the middle of the list seems to be based on the next two items provided by Kohring.

Kohring has supplied an ADN.com publication of an AP story giving Kohring's version of what happened when his office was searched and he spoke to FBI agents on August 31, 2007.[70] According to Kohring, he should have been, but was not given his *Miranda* rights when he was questioned for two hours. The article reports that the

---

[68]*Id.* at pp. 8-9.

[69]*Id.* at p. 9.

[70]*Id.* at pp. 10-11.

United States disputes Kohring's version of the event and points out that a hearing will be held on September 17, 2007, to consider the disputed version of events. While the story reports that earlier Kohring had stated he cooperated with the FBI during the search, it is more significant that the story does not describe any of the evidence which might be suppressed if Kohring prevails. The story reports that trial is set for October 22, 2007, and that Kohring seeks to move the trial to Washington. The story is essentially factual, and is not inflammatory.

The next item is an ADN story which likely provided the basis for the AP story just discussed. It is entitled "Kohring claims detention illegal."[71] This story is largely identical to the AP story, but adds details about the FBI's search of Kohring's office and his questioning by the agents as told from his perspective. This article might be expected to raise some concerns about FBI behavior, but the only suggestion which might redound to Kohring's detriment is the report that on the day of the search he reported that he fully cooperated with the FBI. Like the AP story, this story was published on August 31, 2007, but appears to have been available on-line until September 5, 2007. The story is not fairly characterized as inflammatory, and it appears to have circulated about seven weeks prior to trial.

On October 4, 2007, a story published too late for inclusion in Kohring's memorandum appeared in the print version of the ADN. It was essentially a factual report about the filing of a superseding indictment whose sole effect is to move the time frame of the conspiracy charge back in time to an earlier date, such that it encompasses more alleged payments from Allen to Kohring and Kohring's acquiescence in Allen's request that Kohring fire his legislative aide because he had angered Allen by filing a claim with APOC against Beverly Masek, a former legislator favored by Allen. The story referred to these events as alleged. The story is factual and not inflammatory. The jury will hear evidence supporting these allegations at trial. This story is not of concern.

---

[71] *Id.* at pp. 12-13.

## 2. Other Media

In addition to the items found in print and on-line newspapers, there have been news items on television, and doubtless on the radio, which touch upon Kohring's prosecution and related events. Kohring has provided information from the on-line sites maintained by the three major Anchorage television stations: KTUU.com is maintained by KTUU-TV, "Channel 2," which is an NBC affiliate serving Anchorage, Alaska; KTVA.com is maintained by KTVA, "Channel 11," which is a CBS affiliate; Aksuperstation.com is maintained by KIMO-TV, "Channel 13," which is an ABC affiliate. These on-line postings are obviously intended to serve as surrogates for the broadcasts themselves. They are considered next.

The first item is a story from KTUU.com dated September 18, 2007. The focus of the story is Senator Cowdery's announcement that he will not participate in the special session on the PPT because he does not want his presence "to be a distraction or serve to undermine the hard work and dedication of [his] colleagues."[72] The story states that during the Kott trial, Allen admitted under questioning by the prosecution to bribing Kott, Kohring, Weyhrauch, Cowdery, and Ben Stevens. The story is a factual report of Cowdery's announcement and Allen's testimony and does not contain inflammatory or prejudicial material.

The next story, which was posted on KTUU.com on September 18, 2007, concerns Dyson's testimony during the Kott trial that he encouraged Kohring to cooperate with the FBI. The story contains a transcript of an interview with Channel 2 News' John Tracy and Dyson. In the interview, Tracy states that Kohring's attorney maintains that he only learned of Dyson's role with the FBI at the Kott trial and now claims Dyson was working for the government when he attempted to get Kohring to reach a deal with the "feds." Tracy then asks Dyson if he was working on behalf of prosecutors when he encouraged Kohring to work with the FBI. Dyson responds,

> Absolutely not. I probably was foolish in trying to help my buddy Vic - who I appreciate and I never encouraged him to work with them. All I encouraged him to do was to go and sit down and talk to them and see what his options were and

---

[72]Doc. 73-7 at p. 9.

I assumed he would bring his attorney with him if and when he decided to have those conversations. But, the FBI not only didn't ask me to do it, they were really upset that I did. And it's amazing to me the mess that it has caused and there was no attempt at all to get him to cop a plea bargain or something with them. I just wanted him to know what his options were and see what he could work out.[73]

In the interview, Tracy states that while some people may think Dyson is a "hero" for trying to help root out ongoing corruption in the state system, others might consider him a "snitch." The article and interview do not draw any inferences about Kohring, and seem more likely to generate feelings about Dyson, than about Kohring.

The next posting from KTUU.com is dated September 17, 2007, and is entitled, "More lawmakers may be snared in corruption scandal." The story reports that testimony in Kott's trial has implicated more lawmakers than those who have been indicted, including Ben Stevens, Ted Stevens, and John Cowdery, and contemplates why the others who have been implicated have not been charged. A former federal prosecutor is reported as saying that in "complicated cases like these, time is on the side of the prosecution and there is no rush."[74] The only reference to Kohring in the story is the statement, "The focus remains on Kott for now, and Vic Kohring is on deck."[75] The article does not focus on Kohring, and does not contain any inflammatory or prejudicial material.

The next story was also posted on KTUU.com on September 17, 2007. The story focuses on Dyson's role in getting Allen to cooperate with the FBI, but reports that "Dyson also reached out to former legislator Vic Kohring to suggest he sit down with prosecutors and discuss his options." The story states that Kohring's attorney "vigorously" protests Dyson's representation that "he was acting on his own, not for the

---

[73]Doc. 73-8 at p. 1.

[74]*Id.* at p. 3.

[75]*Id.*

-30-

FBI."[76]  Here again, the story focuses on Dyson and does not make any inferences about Kohring, inflammatory or otherwise.

The next article, which was posted on KTUU.com on September 25, 2007, reports that the jury found Kott guilty on three of four counts.  The only reference to Kohring is the statement that in October, "former Rep. Tom Anderson, the first lawmaker to be found guilty, is sentenced, and another former colleague of his and Kott's, Vic Kohring, goes on trial."[77]  The article also contains the reactions of Sen. Johnny Ellis and Rep. Les Gara, both Democrats, to the verdict.  Gara states that "anybody who strategized with VECO to undermine the state's interests, and we know all the people indicted did that...they valued private interest over the public interest so my stomach was turned from day one."  Gara's statement suggests his own ill feelings towards all of those indicted, but is not inflammatory enough to incite a wave of public passion against Kohring.

On September 16, 2007, KTUU.com posted two stories, one by the Associated Press and the other by a KTUU reporter, about Kohring's attorney's claim that the Department of Justice inappropriately pressured Kohring to consider pleading guilty in the corruption case.  Both stories state that Kohring's attorney wants the court to review the agency's actions.[78]  Both stories also report that the pressure culminated recently when Kohring's former aide received a call from Senator Dyson's aide with the message "to take a plea deal."  Neither story contains inflammatory or prejudicial material about Kohring.  If anything, the stories are more likely to illicit negative sentiment towards the Department of Justice and/or Dyson than Kohring.

Kohring next provides a story which was posted on KTUU.com on September 14, 2007, concerning the testimony of Allen and Smith in the Kott trial.[79]  The story centers on Allen and Smith's testimony implicating Kott.  However, the story also reports that

---

[76]*Id.* at p. 5.

[77]*Id.* at p. 7.

[78]*Id.* at pp. 8-11.

[79]*Id.* at pp. 12-13.

-31-

when asked who they bribed, Smith named Kott, Kohring, Weyhrauch, Ben Stevens, and Cowdery, and Allen named Kott, Kohring, and Stevens. The piece is a factual reporting of testimony which is akin to what will be given at Kohring's trial.

The next piece was posted on KTUU.com on September 13, 2007, and contains "odds and ends from the Kott trial." The only reference to Kohring is the statement that "Allen says he gave Vic Kohring money because he was sleeping in his office, couldn't afford a ticket to Portland to see his wife and couldn't buy a Girl Scouts uniform for his daughter."[80] No conclusion is drawn about the credibility of Allen's statements. As indicated earlier, the United States has said that Allen will testify at Kohring's trial.[81] Allen can be expected to say essentially the same things at Kohring's trial where he will be subject to cross-examination by Kohring's lawyer.

Another brief piece was posted on KTUU.com on September 12, 2007. The piece, entitled "Kohring prepares for trial," is factual in nature and does not contain any prejudicial or inflammatory material.[82]

On September 7, 2007, KTUU.com posted an article about the efforts of Vic Kohring's parents to raise funds for their son's legal defense. The article states that Heinz and Dolores Kohring have sent a fundraising letter on their son's behalf to at least seven lobbyists, and one current legislator. One of the lobbyists is reported as saying that while he's sure Kohring's parents have good intentions, "this is just not an appropriate way to raise money under these circumstances."[83] While the article focuses on Kohring's parents, the opening sentence of the article states, "Former State Rep. Vic Kohring, indicted on charges that he sold his vote to a special interest last year, now is soliciting lobbyists for contributions to his legal defense fund."[84] The statement, which

---

[80]*Id.* at 14.

[81]Doc. 82.

[82]Doc. 73-8 at p. 15.

[83]*Id.* at p. 16.

[84]*Id.*

-32-

suggests that Kohring himself is behind the solicitation, could generate unfavorable sentiments about Kohring. However, any such effect is tempered by the rest of the article and the fact that the article appeared online about six weeks before Kohring's trial date.

The next piece, which was posted on KTUU.com on September 5, 2007, concerns the severance of Weyhrauch's and Kott's cases, and the potential delay of Weyhrauch's trial for up to two years due to the United States' appeal of one of the court's rulings concerning Weyhrauch. The piece reports that other defendants in the corruption probe and community members "have insinuated that the FBI has been intimidating, heavy-handed and even trampled Constitutional rights in pursuit of its case."[85] The piece specifically states that Kohring "says he was denied his constitutional rights against unreasonable search and seizure and against self-incrimination when he was interrogated by the FBI last year."[86] The majority of the piece is factual and not inflammatory in nature. The comments contained in the piece question the government's conduct, not Kohring's conduct.

The next three items submitted by Kohring are retrospective pieces posted on KYUU.com, commemorating the one-year anniversary of the FBI raid of six legislators' offices and VECO offices on August 31, 2006. The first article contains a factual reports of the raids, Tom Anderson's arrest, the passage of an ethics reform bill during the next legislative session, the indictment and arrest of Weyhrauch, Kott and Kohring, Anderson's conviction on the same day Governor Palin signed the ethics bill into law, the spread of the public corruption probe to Alaska's Congressional Delegation, and Palin's consideration of whether the Legislature should apply the Open Meetings Law to itself.[87] The second article focuses on how the raids "brought a new consciousness to Alaskans" about the conduct of some elected officials and the possible need for

---

[85]Doc. 73-9 at p. 2.

[86]*Id.*

[87]*Id.* at pp. 3-6.

-33-

changes to how the Legislature conducts its business.[88]  The third article reports that, in the year since the raid, "doors have opened" to ethics reform.[89]  The article states that three other former lawmakers, including Kohring, face trial, but that even the conclusion of those trials "apparently will not be the end" in light of the ongoing probes into Ben Stevens, Ted Stevens, and Don Young.  All three of the above articles are factual in nature, and none of them contain material which would fan the flames of public passion against Kohring.  Moreover, the articles were all posted almost two months prior to the date Kohring's trial is set to begin.

Kohring next proffers an opinion piece posted on KTUU.com on August 29, 2007, concerning allegations Kohring's attorney made about the local media in Kohring's motion for a change of venue to Washington state.  The article quotes Kohring's attorney as writing, "The media accounts are ripe with prejudicial and inflammatory materials inadmissible at trial that serve solely to create bias against Mr. Kohring."  The author, albeit in a sarcastic manner, suggests that the reporters "simply sought to inform the public about a high-profile court case."  Although the author clearly disagrees with the allegations made by Kohring's attorney, the opinion piece ends with the statement that "Kohring is entitled to a fair trial, including a change of venue, if in the judgment of the court an unbiased jury could not otherwise be assembled," and the assertion that while Kohring is presumed innocent, "his lawyer's media-bashing is Faganesque in its failure to grasp the tenets of Journalism 101."[90]  The opinion piece is not focused on Kohring's actions but on his attorney's representations about the media.  While colorful, the opinion piece is not likely to evoke "a huge wave of public passion' against Kohring. It is also noteworthy that this item was posted in August.

The next piece is an article that was posted on KTUU.com on April 29, 2007, concerning Kohring's motion to suppress evidence and motion for a change of venue. The article states that in his motion to suppress, Kohring alleges that the FBI violated

---

[88] *Id.* at pp. 7-8.

[89] *Id.* at pp. 9-10.

[90] *Id.* at p.11.

-34-

his constitutional rights, "specifically the Fourth Amendment prohibition against unreasonable searches and seizures and the Fifth Amendment prohibition against compelling self-incriminating testimony."[91]  The article reports Kohring's allegations that the FBI threatened him and created an "intimidating scene" at his office.  The article also reports that Kohring is trying to move his trial to Western Washington on the grounds that "negative publicity threatens to rob him of a fair and impartial jury," and the upcoming legislative session on oil taxes, which is scheduled to overlap with his trial in October, may have possible negative impacts.[92]  This article, which provides a factual summary of Kohring's motions and his basis for filing them, is not inflammatory.

The next item submitted by Kohring is a blog which was posted on KTUU.com on August 28, 2007, which contains several references to Kohring.  The blog first states, "Former Rep. Vic Kohring - part of the 'taint' that the governor wants to remove from the current oil production tax - has asked for a change of venue for his trial."  The blog next states, "I predict a joke about relocating it to Portland, which has been the home of his wife, a fact which has raised residency issues in his campaigns."  The blog finally states that Kohring's motion for a change of venue includes part of a posting from the same blog earlier in August, which states in part, "Picture this potential confluence of events in October: Weyhrauch's and Kott's trial has just concluded, Kohring is on trial, bids for a gas pipeline license come in under AGIA, and the Legislature is in session on PPT."[93]  The blog is potentially prejudicial in that it refers to Kohring as part of the "taint" the governor wants to remove from the current PPT and raises concerns about Kohring's residency.  However, the blog is clearly one person's opinion and is not presented as a factual account.  Moreover, any prejudicial effect would be minor given the passage of time between the blog's posting and the beginning of Kohring's trial.

---

[91] *Id.* at p. 12.

[92] *Id.*

[93] *Id.* at pp 14.

The court next considers a series of brief "articles" which were posted on KTVA.com on September 14, 2007,[94] concerning the Kott trial. The first article reports that Allen testified in Kott's trial that "he bribed Ben Stevens, Kott and Vic Kohring, but did not elaborate during 15 minutes of testimony."[95] The next articles state that the court dismissed a juror in the Kott trial based on a letter to the editor written by the juror and published in the Kenai Daily News. The next article focuses on Kott's attorney's attempts to discredit Allen. The only reference to Kohring is the statement that "[f]or the second day, Allen admitted not only to bribing Kott, but Vic Kohring and Ben Stevens, and others in excess of 400,000 dollars." The next articles report Allen's testimony that he paid VECO employees to remodel Ted Steven's Girdwood home, gave Ben Stevens over $200,000, and tried to protect his employees in his plea agreement. The next article covers Legislative Affairs Deputy Director Jayne Schoenfield's testimony about Kott's travel to a meeting in Washington, D.C. The final article reports the beginning of Smith's testimony, and states that VECO relied on Kott, Ben Stevens, and Cowdery to push their PPT agenda. None of the above articles contain inflammatory or prejudicial material; rather, they provide a factual accounting of testimony at the Kott trial.

The next article, which was posted on KTVA.com on September 11, 2007, states that audiotapes were played in Kott's trial of Allen, Smith, and Kott discussing a number of lawmakers' stances concerning the PPT. Names mentioned in the audiotape include Kohring, Weyhrauch, Anderson, McGuire, and six other legislators.[96] The tapes would probably be admissible in Kohring's trial. Nothing in the article is inflammatory or prejudicial.

The next two articles were posted on aksuperstation.com on September 14 and 15, 2007. The first article concerns Allen and Smith's testimony on day 5 of the Kott trial and reports that Allen testified that he "gave Kohring money to make sure he stayed

---

[94] *Id.* at pp. 15 -17.

[95] *Id.* at p 15.

[96] *Id.* at p. 18.

-36-

motivated to work on the natural gas pipeline tax."[97]  The article also states that Smith is accused of bribing Kohring, Kott, Weyhrauch, Ben Stevens, and Cowdery.  The second article, which concerns Allen's testimony on day 4 of the Kott trial, states that Allen admitted to bribing Kott, Kohring, and Ben Stevens.[98]  The article refers to Allen's admission that he bribed Stevens and Kohring as a "bombshell."  The bombshell reference appears to go more to Stevens, as he is not indicted.  Both articles are otherwise factual accounts of testimony and are not inflammatory.

The next series of articles were all posted on KTUU.com.  The first article, dated September 26, 2007, states that with Kott's trial "a thing of the past, government prosecutors set their sights on former state Rep. Vic Kohring."  The article states that the evidence against Kohring is similar to that presented against Kott, namely video tapes from the Baranof Hotel and taped phone calls.  The author of the article opines that the public now knows how effectively this evidence "plays in front of a jury." Although the article has a somewhat ominous tone, it does not draw inferences about Kohring's guilt *per se*.  While it does suggest how juries may have reacted to recorded conversations, it does not discuss conversations involving Kohring.

The final series of on-line articles submitted by Kohring were also posted on KTUU.com.  Three of the five articles are duplicates of materials previously submitted and have already been reviewed herein.[99]  The next on-line article, which was posted on September 19, 2007, is divided into two sections.[100]  The first section covers the testimony of Deborah Stovern, Pete Kott's girlfriend, at his trial.  In her testimony, Stovern recounts how VECO's Rick Smith came up with the Corrupt Bastards Club ("CBC") moniker after Lori Backes, a supporter of the "All Alaska Gasline," wrote an editorial column targeting lawmakers who had taken money from VECO.  Kohring is not mentioned in the first section of the article.

---

[97]*Id.* at p. 19.

[98]*Id.* at p 20.

[99]Doc. 73-13 at pp. 1-2, 7-8, 9-10.

[100]*Id.* at pp. 3-4.

The second section reprints the spring 2006 column by Backes that "gave birth to the CBC." The column, "Does oil money buy influence in the Legislature?," reports that between 1998 and 2004, VECO employees and their family members contributed about $914,929 to Alaska political campaigns. Backes goes on to list 12 legislators who have received contributions from VECO executives, as well as the amounts they received. Kohring is one of the legislators listed. Backes further writes that the actions of some politicians suggest that the oil industry's "investments" in Alaska politics have afforded the oil industry "undue influence." In support, Backes cites Kohring's "patent refusal to move any legislation that might result in increased state revenue from the oil industry," Ben Steven's support for the "change in oil and gas tax as introduced, despite testimony from experts that it is filled with potentially disastrous flaws," and then Governor Murkowski's negotiation of a "secret sole-source" deal with gas producers. Backes encourages her readers to replace legislators with those who are loyal to Alaskans and the Constitution. While the article, which is over one year old, suggests that Kohring has been unduly influenced by contributions from VECO, it predates his indictment and does not draw any inferences about his guilt on the charges against him.

The final on-line article submitted by Kohring was posted on September 15, 2007.[101] The article reports that in addition to Allen and Smith's testimony that Kohring was among five legislators they bribed, it appears that Tom Anderson and Frank Prewitt, while cooperating with the government, made recordings of their interactions with Kohring that may be used against Kohring at his upcoming trial. The article also reports that Kohring is trying to "block incriminating statements he made." While this is theoretically a concern, because the statements might not be admitted at trial, it must be noted that the report does not say what the statements were.

### 3. Cumulative Impact

For the reasons discussed in the previous sections, it is easy to see that none of the individual media items warrant a finding of presumed prejudice, but the controlling question is what is the cumulative impact of the publicity on the community. There

---

[101] *Id.* at pp. 5-6.

-38-

surely has been a lot of publicity, a significant portion of which does concern or at least mention Kohring. However, the publicity has been spread over a period of many months. Most of it consists of entirely factual news stories. The worst of the very modest amount of material which could be characterized as inflammatory (the Frontiersman cartoons) appeared months before trial. The news media have shown strong interest in the previous trials, the testimony implicating former President of the State Senate Ben Stevens, and the possibility that VECO's influence could have corrupted politicians who hold statewide office, but this interest has been expressed almost entirely in factual accounts that are measured in tone and not inflammatory. What emerges from an assessment of the media reports in their totality is a picture of factual, fair, and non-inflammatory reporting and commentary stained only here and there with an inflammatory remark or story which gives a glimpse of information that will not be admitted as evidence at trial. This is insufficient to support a finding of the requisite "huge wave of public passion" against Kohring.

## V.  CONCLUSION

All of the media items taken separately and in combination are dramatically different in tone and character from the wave of news stories which aroused concern in *Irwin* and *Daniels* and gave rise to findings of presumed prejudice. Here, one might accurately say that there has been a barrage of publicity about Anderson, Kott, Weyhrauch, VECO, Allen, Smith, Kohring and others, but there has been no barrage of inflammatory publicity about Kohring. Neither has there been a huge wave of public passion directed at any of the defendants  The accuracy of this assessment is underscored by the relative ease with which the court seated juries for the Anderson and Kott trials.[102]  The same procedure, which will include intensive questioning about pre-trial publicity, will be used in this case.

---

[102]The same judge has been assigned to the Anderson, Kott, Weyhrauch, and Kohring cases.

-39-

There is another way in which the experience of seating juries in the Anderson and Kott trials is instructive. The fact is that the public at large is simply not as attuned to local news as it was in an earlier era when *Irwin* was decided or when the news accounts were published which were considered in *Daniels*–the case was decided in 2005, but dealt with a medai reports from the early 1980s. To put it bluntly, a surprising number of prospective jurors are just not interested in, and do not follow, local news. Many don't even read local newspapers. Many do not watch the local news on television. Among those who do read the newspaper, many simply glance at the local news headlines while moving on to areas of interest such as sports or gardening. Many who watch television are looking for entertainment programs, not local news. To be sure, there are still many citizens who seek to stay informed about local events, but the tacit assumption that there is nearly universal interest in local news which underpins cases like *Irwin* and *Daniels* is an increasingly questionable assumption. While this court is not, of course, free to ignore the teaching of cases like *Irwin* and *Daniels*, it does suggest that this court should be especially mindful of the admonition that prejudice may be presumed only in extreme cases where a community is literally saturated with inflammatory and prejudicial publicity.[103] That is not the situation with respect to the community from which Kohring's jury will be drawn. The motion at docket 36 is **DENIED**.

DATED at Anchorage, Alaska, this 5th day of October 2007.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[103]*Daniels v. Woodford* at 428 F, 3d 1211.

Case 3:07-cr-00055-RRB   Document 86   Filed 10/09/07   Page 40 of 40