**UNITED STATES DISTRICT COURT**

**DISTRICT OF ALASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **3:07-cr-00055-JWS** |
| | ) | |
| **VICTOR H. KOHRING,** | ) | **ORDER AND OPINION** |
| | ) | |
| **Defendant.** | ) | **[Re:   Motions at Docket Nos. 155,** |
| _____ | ) | **167, and 173]** |

## I.  MOTIONS PRESENTED

At docket 155 defendant Victor H. Kohring moved to dismiss the indictment or grant a new trial and recusal of the undersigned.  At docket 162 the United States opposed the motion, and at docket 166 Kohring replied.[1/]  At docket 167 Kohring moved for an evidentiary hearing, which the United States opposed at docket 171.  Kohring replied at docket 172.  At docket 173, the United States moved to strike the  reply at docket 172.  Oral argument would not materially assist the court in deciding the motions presented.

## II.  BACKGROUND

A brief chronological history of this case will assist the reader in understanding the court's disposition of the motions at issue.

_____

[1/] Although the court does not normally consider matters raised for the first time in a reply brief, in this case, given its somewhat unusual nature and evidentiary basis, the Court has considered the exhibits attached to the reply brief to the extent they relate to matters raised in the motion.

<u>May 1, 2007</u>:  The Grand Jury returned a four-count indictment charging Kohring with: (1) Conspiracy to Commit Extortion and Attempted Extortion Under Color of Official Right and Bribery (18 U.S.C. § 371); (2) Interference with Commerce by Extortion Induced Under Color of Official Right (18 U.S.C. § 1951(a) and § 2); (3) Attempted Interference with Commerce by Extortion Induced Under Color of Law (18 U.S.C. § 1951(a) and § 2); and (4) Bribery Concerning Programs Receiving Federal Funds (18 U.S.C. § 666(a)(1)(B) and § 2).[2]  The case was assigned to this court.

<u>October 22, 2007</u>:  Trial by jury commenced.[3]

<u>November 1, 2007</u>:  The jury returned a verdict of guilty on Counts 1, 3, and 4, and not guilty on Count 2.[4]  The court set February 6, 2008, for the sentencing hearing.[5]

<u>January 28, 2008</u>: The sentencing hearing was continued to February 11, 2008.

<u>February 1, 2008</u>:  Defendant filed the motion at docket 155 citing Federal Rule of Criminal Procedure 33(a)(1), 28 U.S.C. § 455, and Canon 3 of the Code of Conduct for United States Judges.

<u>February 4, 2008</u>:  The motion at docket 155 included a request that it be decided by another judge and, in an abundance of caution, the motion was referred to Hon. H. Russel Holland for decision, and the February 11, 2008 sentencing date was vacated.[6]

<u>February 6, 2008</u>:  Judge Holland held that the motion made under § 455, not § 144," is addressed to, and must be decided by, the very judge whose impartiality is being questioned," citing *In re Bernard*, 31 F.3d 842, 843 (9th Cir. 1994).[7]

---

[2] Docket No. 2.

[3] Docket No. 110.

[4] Docket Nos. 141, 144, 145, 146, and 147.

[5]Docket No. 140.

[6] Docket No. 158.

[7] Docket No. 160.  Although *Bernard* was an order entered by a single judge, not a panel, and may not be controlling, *Bernard* cited *United States v. Silba*, 624 F.2d 864, 868 (9th

### III.  CONTROLLING STATUTES

There are two statutory provisions which control the recusal of federal judges. They are 28 U.S. § 144 and 28 U.S.C. § 455.  Canon 3 of the Codes of Conduct for United States Judges contains similar standards.  All three are set out in this section.

28 U.S.C. § 144 provides:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time.  A party may file only one such affidavit in any case.  It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 455 provides:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject

---

Cir. 1980), holding the same, and *Silba* is controlling precedent.

Case 3:07-cr-00055-RRB   Document 176   Filed 04/14/08   Page 3 of 29

matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(I) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

(I) Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

-4-

(iv) Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(e) No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b).  Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

(f) Notwithstanding the preceding provisions of this section, if any justice, judge, magistrate judge, or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a fiduciary, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the justice, judge, magistrate judge, bankruptcy judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.

Kohring also relies on Canon 3 of the Codes of Conduct for United States Judges, entitled "A Judge Should Perform the Duties of the Office Impartially and Diligently."  That Canon provides in relevant part as follows:

C. Disqualification.

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:

(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness;

(c) the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be affected substantially by the outcome of the proceeding;

(d) the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person:

-5-

(I) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or

(iv) is to the judge's knowledge likely to be a material witness in the proceeding.

(e) the judge has served in governmental employment and in such capacity participated as counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy.

(2) A judge should keep informed about the judge's personal and fiduciary financial interests, and make a reasonable effort to keep informed about the personal financial interests of the judge's spouse and minor children residing in the judge's household.

(3) For the purposes of this section:

(a) the degree of relationship is calculated according to the civil law system; the following relatives are within the third degree of relationship: parent, child, grandparent, grandchild, great grandparent, great grandchild, sister, brother, aunt, uncle, niece and nephew; the listed relatives include whole and half blood relatives and most step relatives;

(b) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(c) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party, except that:

(I) ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii) an office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) the proprietary interest of a policy holder in a mutual insurance company, or a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

Case 3:07-cr-00055-RRB   Document 176   Filed 04/14/08   Page 6 of 29

(iv) ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(d) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation.

(4) Notwithstanding the preceding provisions of this Canon, if a judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a fiduciary, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.

## IV.  MOTIONS AT DOCKETS 167 AND 173

The motion for hearing at docket 167 is founded upon an erroneous assumption, *viz*, that the motion at docket 155 is premised upon both 28 U.S.C. § 144 and § 455. Judge Holland's February 6, 2008 order held that the motion was made solely pursuant to § 455.  That order stands as the law of the case.  Under the law-of-the-case doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case subject to three exceptions that may arise when (1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial.[8] None of these exceptions applies here.  The law-of-the-case doctrine applies with equal force to interlocutory orders that are not immediately appealable.[9]  Moreover, to the extent that Kohring seeks to characterize the motion as one under § 144, it does not comply with the requirement that it be supported by an affidavit.[10]  Appended to the

---

[8] *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002).

[9] *Pit River Home and Agr. Co-Op, Ass'n v. United States*, 30 F.3d 1088, 1097 (9th Cir. 1994).

[10] *See Liljeberg v. Heath Svs. Acquisition Corp.*, 486 U.S. 847, 871 (1988) (Rehnquist, C.J., dissenting); *Davis v. Fendler*, 650 F.2d 1154, 1163 (9th Cir. 1981) (holding that the failure

motion as Exhibit D is a document entitled "Affidavit of Victor H. Kohring."[11]  However, that document was neither sworn before a notary public nor executed under penalty of perjury in compliance with 28 U.S.C. § 1746.   The motion at docket 155 is also defective as a motion under § 144, because the motion is not accompanied by the required certificate of counsel that it is made in good faith.  Thus, the motion to recuse at docket 155 must be considered pursuant to § 455 only.

There is no requirement that the court in deciding a motion under § 455 hold an evidentiary hearing.  Indeed, the "facts" that give rise to the level where the "impartiality [of the judge] might be reasonably questioned," are, for the most part, peculiarly within the knowledge of the judge.  In fact, in considering recusal under § 455, a judge is expected to take into consideration those facts of which he or she has personal knowledge that have a bearing on the issue.[12]

In his motion, Kohring argues that no credence should be given to the unsworn statements of the undersigned in the order referring the matter to Judge Holland and that an evidentiary hearing is required "so that the defense can exercise its constitutionally provided rights of confrontation and cross examination."  Defendant fails to cite any authority for the novel theory that he has a constitutional right to confront and cross-examine the judge on a § 455 motion.  Defendant further asserts "it [is] irresponsible on the part of Judge Sedwick to include unsworn statements in a judicial order."  This statement is somewhat incongruous inasmuch as the motion filed by Kohring is itself principally based upon unsworn statements in what counsel erroneously

---

to file an affidavit defeats a charge of bias under § 144); *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir. 1980) ("Section 144 expressly conditions relief upon the filing of a timely and legally sufficient affidavit."); *United States v. Azhocar*, 581 F.2d 735, 738 (9th Cir. 1978) (holding that failure to file an affidavit defeats a charge of bias under § 144).

[11] Docket No. 155-5.  Hereinafter referred to as "Kohring Statement."

[12] *See, e.g., United States v. Balistrieri*, 779 F.2d 1191, 1202 (7th Cir. 1985).

-8-

refers to as an "affidavit." In any event and more importantly, including unsworn statements in recusal orders is a common practice followed by federal judges.[13]

For the foregoing reasons, Kohring's Motion for Evidentiary Hearing Regarding New Trial and the Recusal of Judge Sedwick at docket 167 will be denied. The United States' Motion to Strike Defendant's Reply Brief in Support of Motion for Evidentiary Hearing at docket 173 will be denied as moot.

## V. MOTION AT DOCKET 155

### A. Request for New Trial

The motion at docket 155 includes a request for a new trial. The motion was filed three months after the verdict was entered. Under Rule 33(b),[14] unless a request for new trial is based upon newly discovered evidence, it must be brought within seven days of the date the verdict is entered. In its opposition, the United States argued that the motion is untimely. Because the motion at bar was filed far more than seven days after the verdict was entered, unless it is based upon newly discovered evidence, it is untimely and should be denied.[15]

---

[13] *See, e.g., M2 Software, Inc. v. M2 Communications, LLC,* 463 F.3d 868, 869 (9th Cir. 2006) (Pregerson, J. specially concurring); *In re Bernard, supra* (Kozinski, J.).

[14] Rule 33, Federal Rules of Criminal Procedure:
(a) Defendant's Motion. Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.

(b) Time to File.

    (1) Newly Discovered Evidence. Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

    (2) Other Grounds. Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.

[15] *See Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam) (holding that Rule 33 is an inflexible claim-processing rule that assures relief to a party properly raising it).

-9-

A motion for a new trial based on newly discovered evidence should be granted where the following criteria are met: (1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal.[16] Each one of the criteria is to obtain a new trial.[17]

The "newly discovered evidence" asserted by Kohring in this case consists of the information which he contends demonstrates bias or lack of impartiality of the trial judge. Assuming *arguendo* that the failure to discover the "evidence" sooner was not the result of a lack of due diligence, the "evidence" clearly fails the third and fifth prongs: it is patently immaterial to the issues at trial and would not probably result in acquittal. It follows that the request for a new trial included in the motion at docket 155 will be denied.

**B. Recusal of Trial Judge**

In the motion at docket 155, Kohring seeks the court's recusal based on what he styles the "appearance of fairness doctrine."[18] The court reads this as encompassing the provision in § 455(a) which requires recusal where a judge's "impartiality might reasonably be questioned."[19] When a party has made a motion under § 455 and the challenged judge is aware of legally sufficient grounds for disqualification, he or she ordinarily must recuse.[20]

---

[16] *United States v. Kulczyk,* 931 F.2d 542, 548 (9th Cir. 1991).

[17] *See United States v. Jackson,* 209 F.3d 1103, 1106 (9th Cir. 2000).

[18] Docket No. 155 at pp. 8-12.

[19] Kohring does not allege any facts or make any argument that would fall within the actual conflict provisions of § 455(b)

[20] *United States v. Jaramillo*, 745 F.2d 1245, 1248 (9th Cir. 1984); *United States v. Sibla, supra.*

-10-

### 1. Timeliness

The United States asserts that the request is not timely. Section 455 does not set out any specific time limit. However, the Ninth Circuit has held that there is a timeliness requirement inherent in § 455.[21] Although the Ninth Circuit has not set a "bright line" or *per se* rule for determining timeliness under § 455, it has held that the motion must be made within a reasonable time after the grounds for seeking disqualification are known.[22]

Here, even assuming that the marriage between the undersigned and Deborah Sedwick could not have been discovered with due diligence prior to the start of trial and accepting Kohring's statement that he did not make the connection between the undersigned and Ms. Sedwick until 7 to 10 days after the trial ended, does not explain the additional delay of more than two months in bringing the motion. In his reply brief in response, Kohring responds on the timeliness issue, saying that research in voter records and on the internet was needed, "for the defense does not take lightly the prospect of challenging the presumed impartiality of a sitting federal judge."[23] He also indicates that the defense had to "confer with colleagues, friends, legal scholars and even federal judges all of whom echoed that under the appearance of fairness doctrine Judge Sedwick should have recused himself."[24] These statements in the brief are not only not evidence, but include assertions that are incredible–it is literally amazing to contemplate the assertion that one or more federal judges actually did offer Mr. Browne the gratuitous opinion that another federal judge should have recused himself in a pending case in which Mr. Browne was appearing. In any event, there is no evidentiary support for the need to delay the motion for two months. Kohring has failed to establish that he filed the motion within a reasonable time after discovering the facts that he now

---

[21] *United States v. Conforte*, 624 F.2d 869, 880 (9th Cir. 1980) ("Timeliness cannot be disregarded in all cases involving the delicate matter of disqualification under section 455 . . .").

[22] *Preston v. United States*, 923 F.2d 731, 732-33 (9th Cir. 1991).

[23] Docket No. 166 at pp. 9-10.

[24] *Id.*, at p. 10.

-11-

asserts give rise to the appearance of a lack of impartiality. The motion is untimely. However, even if one assumes the request to recuse is untimely, it lacks merit for the reasons discussed below.

## 2. Recusal Standard

As has been noted by the Court of Appeals for the Ninth Circuit "The standard for recusal is 'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'"[25/] That appellate court has further explained:[26/]

> By its terms § 455(a) mandates disqualification in a proceeding in which a judge's "impartiality might reasonably be questioned." *Id.* The Supreme Court has advised us that our analysis under subsection (a) requires an "evaluation on an objective basis, so that what matters is not the reality of bias or prejudice but its appearance," *Liteky v. United States,* 510 U.S. 540, 548, 114 S.Ct. 1147, 1153, 127 L.Ed.2d 474 (1994), and we have independently recognized that what is required "is a reasonable factual basis for doubting the judge's impartiality." *United States v. Conforte,* 624 F.2d 869, 881 (9th Cir.) (quotation omitted), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980).

In deciding whether or not to recuse, there are certain basic principles that this court must apply. As recently noted by the Ninth Circuit, the court begins with the general proposition that, in the absence of a legitimate reason to recuse himself, a judge should participate in cases assigned.[27/] However, equally as clear is the proposition that "§ 455(a) requires judicial recusal 'if a reasonable person, *knowing all*

_____

[25/] *Sewer Alert Committee v. Pierce County*, 791 F.2d 796, 798 (9th Cir. 1986), quoting *United States v. Nelson*, 718 F.2d 315, 321 (9th Cir. 1983); *see also In re Grand Jury 95-1*, 118 F.3d 1433, 1438 (10th Cir. 1997) (same); *Union Planter's Bank v. L & J Dev. Co., Inc.*, 115 F.3d 378, 383 (6th Cir. 1997) (same); *United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997) (same).

[26/] *United States v. Rogers*, 119 F.3d 1377, 1383 (9th Cir. 1997).

[27/] *United States v. Holland*, __ F.3d __, 2008 WL 696903, *2 (9th Cir. March 17, 2008).

*the circumstances*, would expect the judge to have actual knowledge of his interest or bias in the case.'"[28]

Section 455 claims are fact driven, thus the analysis of each claim must be guided by an independent examination of the unique facts and circumstances of a particular claim.[29]  In making a determination under § 455 several factors come into play.

First, "[t]he judge does not have to be *subjectively* biased or prejudiced, as long as he *appears* to be so."[30]

Second, "[t]he reasonable third-party observer is not a partly informed man-in-the-street, but rather someone who understand[s] all the relevant facts and has examined the record and law."[31]  "The reasonable person in this context means a well-informed, thoughtful observer, as opposed to a hypersensitive or unduly suspicious person."[32]

Third, the "extrajudicial source" doctrine applies to motions under § 455(a) as well as those under § 455(b).[33]  The Supreme Court, after referring to the extrajudicial aspect as a factor rather than a doctrine, described its operation in the following terms:[34]

> The facts of the present case do not require us to describe the consequences of that factor in complete detail. It is enough for present

---

[28] *Sao Paulo State of Federative Republic of Brazil v. American Tobacco Co., Inc.*, 535 U.S. 229, 232–33 (2002), quoting *Liljeberg v. Heath Svs. Acquisition Corp.*, 486 U.S. 847, 861 (1988) (emphasis in the in the original).

[29] *Clemens v. United States Dist. Court for Central Dist. of California*, 428 F.3d 1175, 1178 (9th Cir. 2005).

[30] *Liteky v. United States*, 510 U.S. 540, 553 n.2 (1994) (emphasis in the original).

[31] *United States v. Holland*, 2008 WL 29690, * 4 (internal quotation marks and citations omitted).

[32] *Clemens*, 428 F.3d at 1178 (internal quotation marks and citations omitted).

[33] *Liteky v. United States*, 510 U.S. at 554.

[34] *Id.*, at 555.

-13-

purposes to say the following:  First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.  See *United States v. Grinnell Corp.,* 384 U.S., at 583, 86 S.Ct., at 1710.  In and of themselves (*i.e.,* apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved.  Almost invariably, they are proper grounds for appeal, not for recusal.  Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.  An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German-American defendants:  "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty."  *Id.,* at 28 (internal quotation marks omitted).  *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display.  A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

Finally, there must be a factual showing of a reasonable basis for questioning the impartiality of a judge, or allegations of facts establishing other disqualifying circumstances.  Conclusory statements and counsel's unsupported beliefs and assumptions are of no effect.[35]  "Frivolous and improperly based suggestions that a

---

[35] *Maier v. Orr*, 758 F.2d 1578, 1583 (9th Cir. 1985).

-14-

judge recuse should be firmly declined."[36]  This court will apply these principles to the pending motion to recuse.[37]

### a. Extrajudicial Factors

Kohring raises three extrajudicial factors that he claims require recusal, either individually or collectively: (1) a "combative" or "contentious" relationship that existed between Kohring and the undersigned's spouse between 1997 and 1999, nearly a decade ago; (2) the proximity of the undersigned's residence to that of Bill Allen, a "star witness" for the prosecution; and (3) the undersigned went to high school more than forty years ago with Richard Smith, a "principal witness" for the prosecution.

Neither the fact that Mr. Allen lives in the same neighborhood as the undersigned nor that Mr. Smith attended the same high school, standing alone, would give a disinterested third-party the impression that a judge could not act impartially in a trial where they were witnesses  Kohring has cited no case that has held that mere acquaintance or prior association with a party, let alone a witness, is sufficient cause for recusal.  Independent research by the court has not found any such case.  Indeed, what authority exists takes a contrary position. [38]  Finally, a fully-informed observer would know that in the role of chief judge of the district, it was the undersigned judge who authorized the monitoring of telephones used by  Messrs. Allen and Smith which ultimately led to their own guilty pleas.

The principal extrajudicial factor upon which Kohring relies is described in his papers as the "combative" or "contentious" relationship between Kohring, then a state

---

[36] *Id.*

[37] The court notes that Kohring cites in support of his position the unpublished decision in *United States v. Wolff*, __ Fed.Appx.___, 2008 WL 123568 (9th Cir. January 14, 2008).  The court finds that case inapposite.  The motion to disqualify in *Wolff* was based on § 455(b)(4) (a financial interest in the subject matter in controversy or in a party).  Defendant's analogy to *Wolff* in this case appears to be based upon the erroneous factual statement that the legislation in question actually eliminated Ms. Sedwick's job and reduced the Sedwick household income by at least $10,000 annually.  As explained further *ante*, the bill had no such effect.

[38] *Maier*, 758 F.2d at 1583; *Parrish v. Board of Comm'rs of Alabama State Bar*, 524 F.2d 98, 103 (5th Cir. 1975).

-15-

legislator, and Ms. Sedwick, then an employee of the executive branch of state government, nearly a decade ago.  To succeed on this basis, Kohring must show two things.  First, during the time period in question, which is 1997 through 1999, there actually was real animosity between Kohring and Ms. Sedwick.  Second, that a reasonable person would assume that the trial judge, as Ms. Sedwick's husband, was and for nearly ten years remained aware of that animosity to such an extent that he might not be impartial.[39]  In other words, Kohring must show that a thoughtful and objective person knowing all the circumstances would be inclined to believe that the "combative" or "contentious" relationship between Kohring and Ms. Sedwick nearly ten years ago was sufficiently intense that her husband may reasonably be assumed to bear a grudge against Kohring all these years later.  For the reasons that follow, it is the opinion of the court that no fully informed and thoughtful person would come to that conclusion.

> As stated in the order at Docket No. 153 referring the motion to Judge Holland:

> > I have reviewed defendant Kohring's affidavit and represent that I have no recollection of any conversation with my wife relating to the actions defendant Kohring says he took or the responses he alleges she made.  I also represent that I have no recollection of them from other sources.  With respect to the legislation which defendant Kohring characterizes as having eliminated my wife's position, I have no recollection of his involvement.  I do recall that while my wife was Commissioner of the Department of Commerce legislation was enacted pursuant to which that department was combined with another department, and my wife became the commissioner of the combined department.

Of course, the trial judge's actual lack of bias is not the issue.  The question is, as just noted previously, a fully informed, thoughtful person would reasonably question my impartiality.  To answer that question, one must examine the facts, stripped of

---

[39] The Court is not unmindful that a lack of knowledge of a disqualifying circumstance does not necessarily eliminate the risk that his impartiality might be reasonably questioned by other persons.  *See Lijeberg v. Health Svs. Acquisition Corp.*, 486 U.S. at 859 ("Scienter not an element of a violation of § 455(a).").  All that is required is that a reasonable person, knowing all the facts and circumstances, would expect the challenged judge to have that knowledge.  *Id.* at 860–61.

Case 3:07-cr-00055-RRB   Document 176   Filed 04/14/08   Page 16 of 29

hyperbole, unsupported assumptions, and conclusory opinions. Many of the underlying facts are a matter of public record.

Kohring was a member of the Alaska House of Representatives and the House Finance Committee during the period 1995 through 1999.[40/] In that capacity, he was an avid proponent of cutting state spending.[41/] In furtherance of this goal, Kohring successfully advocated a reduction in the budget of the Department of Commerce and Economic Development ("DCED") and divisions for which Ms. Sedwick bore executive level management responsibility as a political appointee serving at the pleasure of the governor, first as an Assistant Commissioner, and for most of her tenure as Commissioner. Ms. Sedwick, as well as other executive level management officials in the department opposed or, at least expressed disagreement, with the proposed budget cuts.

During the 1998–99 time period, Kohring advocated the merger of the DCED with the Department of Community and Regional Affairs ("DCRA"). Kohring, as a co-sponsor, introduced and actively supported and promoted two bills designed to achieve this end, HB 400 in the 20th Legislature and HB 40 in the 21st Legislature.[42/] Ms. Sedwick, as well as other executive level management officials of both departments, expressed disagreement with the proposed merger and questioned both whether it would result in substantial savings and its impact on the operations of various responsibilities of the two departments. HB 40 became law during the 1999 Legislative session. The merger of the two departments eliminated some upper level, executive management positions, including one commissioner. After HB 40 was passed by the Legislature and signed by the Governor, Ms. Sedwick became the Commissioner of the merged departments.

---

[40/] Kohring's service in the Legislature extended for approximately eight more years, but there is no assertion of any conflict between Kohring and Ms. Sedwick after the end of the Legislative session in the spring of 1999.

[41/] *E.g.,* Exhibits B, C, D, and E attached to defendant's reply at Docket Nos. 166-3 through 166-6.

[42/] Exhibits F, G, and H to defendant's reply at Docket Nos. 166-7 through 166-9.

Case 3:07-cr-00055-RRB   Document 176   Filed 04/14/08   Page 17 of 29

As specific evidence of a perceived animus on the part of Ms. Sedwick, Kohring offers selected historical excerpts, each of which is discussed briefly below.

1. In March 1997 Kohring's budget subcommittee eliminated eight positions and cut 25% of the travel budget, and eliminated the Division of Tourism by merging it with the Division of Trade and Development, both divisions within the department which Ms. Sedwick headed, and imposed significant additional responsibilities on Ms. Sedwick without authorizing additional staff.[43] A March 16, 1997, "Analysis of House Finance Subcommittee Proposed Cuts to the Division of Trade and Development" described the effect of the cuts on certain functions of the Division using terms such as "severely undermine," "decimate," "severely cripple," and similar phrases.[44] While the language used is forceful, it is directed at anticipated consequences of the legislation. It certainly does not display animosity towards Kohring himself or toward any other member of the Legislature.

2. An article in the Anchorage *Daily News* in which Ms. Sedwick simply expressed an opinion that she did not think the merger was going to save money.[45] A comment that reflects nothing more than a skeptical opinion of the results of such a change. There is nothing in it which displays animus toward Kohring.

3. An article in the Juneau *Empire* in which Ms. Sedwick referred to the cost of a similar proposal (merger of the two departments) made previously and the time it would take to recoup the initial cost and further that it made more sense to look at programs and determine whether they are worthwhile and cost-efficient.[46] There is nothing in this article that implies that Ms. Sedwick harbored any animus towards Kohring.

---

[43] Kohring Statement, ¶¶ 4, 5, 7, 8, and 9.

[44] Kohring Statement, ¶ 10. A partial copy of the report is attached as Exhibit A to the defendant's reply at Docket No. 166-2. The copy furnished the Court does not reveal who authored the report; however, for the purpose of ruling on the motion to recuse, the Court assumes it was either authored by or approved by Ms. Sedwick.

[45] Kohring Statement ¶ 14; Exhibit G to defendant's reply at Docket No. 166-8.

[46] Kohring Statement ¶ 13; Exhibit H to defendant's reply at Docket No. 166-9.

-18-

4.  Correspondence from Kohring to Ms. Sedwick in which he responded that he had some concerns over Ms. Sedwick's comments in the Juneau *Empire*.[47/]  This letter appears to (1) explain the fundamental difference between the then current bill (HB 400) and the prior bill and (2) invite Ms. Sedwick's input on HB 400.  There is nothing in the tone of this letter that indicates any animosity on the part of either Kohring or Ms. Sedwick.

5.  An article in the Juneau *Empire* in which, when asked if she would be willing to manage the proposed merged departments, Ms. Sedwick responded "I don't know how I could do that job . . . don't know how one person could do that job," which Kohring describes as opposition to HB 400.[48/]  Indeed, the article does indicate a negative opinion of the legislation, specifically skepticism on Ms. Sedwick's part as to whether supervision of the merged departments was feasible.  However, it says nothing about Kohring and cannot be reasonably read to evidence personal animosity, as contrasted with a different view of appropriate public policy.

6.  A guest column in the *Alaska Star* in which Kohring opines that government officials were fighting the HB 400 because they wished to retain their "cushy jobs."[49/]  However, nowhere in that article does Ms. Sedwick's name appear nor is there a reference to the DCED Commissioner.  The only persons the article refers to as opposing the bill were the deputy commissioners of both affected departments.  Assuming that Ms. Sedwick was even aware of this article, for it to have any significance in the abstract, much less in terms of the alleged animosity against Kohring, one would have to assume that Ms. Sedwick truly viewed her position as "cushy" and, as a political appointee serving at the pleasure of the governor, believed she had job security.

---

[47/] Kohring Statement, ¶ 15; Exhibit I to defendant's reply at Docket No. 166-10.

[48/] Kohring Statement, ¶ 17; Exhibit N to defendant's reply at Docket No. 166-15.  The Court notes that it is reflected in the record that Ms. Sedwick made essentially the same response to a similar question before the House Labor & Commerce Committee, Exhibit M to Defendant's reply at Docket No. 166-14, page 6.

[49/] Kohring Statement, ¶ 20; Exhibit O to defendant's reply at Docket No. 166-16.

7.  A press release issued by Kohring criticizing opponents of HB 400 in which he was quoted as saying ". . . it doesn't surprise me that those whose stand to lose their jobs have come out of the woodwork in opposition."[50/]  Again, this press release does not refer to Ms. Sedwick by either name or title.  Nor, for that matter, is there any evidence that it was published by any news source or that Ms. Sedwick was aware of it.

8.  An April 4, 1998 "Budget Alert" ostensibly issued by Ms. Sedwick in which the proposed budget cuts were referred to as "devastating" and "draconian."[51/]  While the language may be somewhat hyperbolic, it certainly does not show any hostility or animosity towards Kohring himself or any other member of the Legislature.

9.  An April 8, 1998 press release by Kohring in which he named Ms. Sedwick and also referred to "spending money like drunken sailors" and challenged her to "work together with him, instead of shooting from the sidelines" "[52/]  This suffers from two infirmities.  First, there is no evidence that the release was ever published or that Ms. Sedwick was ever privy to it.  Second, from the surrounding text and its lack of juxtaposition with respect to the reference to Ms. Sedwick, contrary to Kohring's characterization, no rational person would construe "spending like drunken sailors" as directed toward Ms. Sedwick personally; rather, it is directed toward state spending overall.[53/]  The lack of connection between Ms. Sedwick and the "drunken sailor" canard is especially obvious when one considers that state spending is the product of Legislative appropriations.

---

[50/] Kohring Statement, ¶ 18; Exhibit P to defendant's reply at Docket No. 166-17. Interestingly, that same press release  also contains the statement that it "would cut over one million dollars in upper management positions."  "This represents primarily salaries and benefits of the Department of Community and Regional Affairs Commissioner's office."

[51/] Kohring Statement, ¶ 24; a copy of this Budget Alert is not appended as exhibit to either the motion or the reply.  However, for the purposes of ruling on the motion, the court assumes that it was issued at the direction of Ms. Sedwick and contained the statements ascribed to it by Kohring.

[52/] Kohring Statement, ¶ 25; Exhibit R to defendant's reply at Docket No. 166-19.

[53/] Between the paragraph naming Ms. Sedwick and the paragraph containing the "drunken sailor" reference is a paragraph that appears to refer to an overall decline in state revenue requiring large budget cuts.

-20-

10.  A report issued six months after the two departments were merged in which it was stated that the merger resulted in an increased workload for the Division of Administrative Services and that further cuts in revenue sharing programs are bound to lead to significant cuts in local public service.[54]  This report contains nothing attacking Kohring, nor can it be reasonably construed as an expression of personal hostility between Ms. Sedwick and Kohring.

11.  That at a budget closeout in April of 1998, in response to a jocular statement that he intended to eliminate all funding to DCED, Ms. Sedwick became visibly upset, glared at the Kohring across the table, was red-faced, and appeared ready to leave.[55]  Even assuming that Kohring's observations were accurate, at most they support a conclusion that Ms. Sedwick was briefly upset by the remark, and perhaps even angry at the time.  However, the fact that Ms. Sedwick did not walk out, but instead remained to answer the questions posed by Kohring and other members of the subcommittee in an even tone belies the accuracy of Kohring's characterization recounted nearly ten years after the event.[56]  So, too, does the palpably jocular nature of Kohring's comment which is very evident when one hears it on the tape of the meeting.  A glance of displeasure and a flash of anger, even if they were actually present in April of 1998, makes for a very slender reed on which to lean Kohring's case for an enduring animosity that a reasonable person would consider to be at work in 2007.

12.  Kohring appended excerpts from the recording of an April 8, 1998 legislative hearing that he contends are illustrative of the antagonistic exchanges between Kohring and Ms. Sedwick.[57]  Defendant also submitted the entire tape,[58] arguing that the

---

[54] Kohring Statement, ¶ 29; Exhibit T to defendant's reply at Docket No. 166-21.

[55] Kohring Statement, ¶ 22-23.

[56] At Docket No. 164, Kohring moved the court to accept an audiocassette of the meeting, and by order at Docket No. 165, the court accepted the video tape.  Kohring supplied the tape at Docket No. 170.  The court has listened to the tape.

[57] Exhibit F to Motion, Docket No. 155-7.

[58] *See* n.56, *supra.*

-21-

"recording more accurately captures the contentious relationship between the Defendant and Judge Sedwick's wife."[59/]  The court having listened to the cassette tape lodged with the court disagrees with Kohring that it illustrates a contentious relationship.  Ms. Sedwick at all times spoke in a level, normal voice and in a calm manner.  She disagreed with Kohring on the merits of several issues, but nothing in her remarks or the tone of her voice could lead a reasonable observer to believe she displayed hostility or antagonism towards any legislator present, including Kohring.  Indeed, anyone who listens to the tape in its entirety would be struck by the civility of the discourse among all who participated–not just Kohring and Ms. Sedwick, but all of the other Legislators as well.

Certain allegations made by Kohring are either inaccurate, misleading, or conclusions without any evidentiary support.  To begin with Kohring states: "In early 1998, as part of a restructuring plan, I proposed House Bill 400 which would have downgraded Commissioner Sedwick's department to a division and would have meant a major pay cut for Ms. Sedwick from approximately $84,000 a year to approximately $73,800 a year."[60/]  This is pure conjecture.  Both the bill in the 20th Legislature and the bill in the 21st Legislature simply merged the two departments but did not specify that DCED would become a division.[61/]  Elimination of one of the departments unquestionably would have resulted in the elimination of a Commissioner and other executive level management officials.  However, while its effect *may have* resulted in the demotion of Ms. Sedwick from Commissioner to the director of a division, there is no evidence, direct or indirect, from which it may logically be inferred that it was directed at Ms. Sedwick personally or that she considered that as being its purpose.

[59/] Motion to File Cassette Tape.  Docket No. 164.

[60/] Kohring Statement, ¶ 12.

[61/] Accessible online at http://www.legis.state.ak.us/PDF/20/Bills/HB0400B.PDF(HB 400); http://www.legis.state.ak.us/PDF/21/Bills/HB0040F.PDF (HB 40).

-22-

Kohring also claims that HB 40 "eliminated Ms. Sedwick's department including her position as Commissioner of DCED."[62] This statement, standing alone, is at best incomplete and misleading. It is unquestionably correct that HB 40 eliminated DCED and Ms. Sedwick's position as Commissioner of *that department* was also necessarily eliminated in the sense it was merged with another department; however, in fact, Ms. Sedwick became the Commissioner of the merged departments.

With his reply memorandum, Kohring submitted the affidavits of three former aides to Kohring: Fred James, Elizabeth Madsen, and Michael G. Krieber.[63] All three affidavits follow a similar pattern and draw a similar conclusion—that it was evident to the aide that a state of hostility and antagonism existed between Kohring and Ms. Sedwick. Except to the extent that they describe Ms. Sedwick's opposition to the budget cuts, the statements contained in the three affidavits simply express conclusory personal opinions not supported by any meaningful and specific facts. What few factual statements they do contain are ambiguous or isolated. They would not convince a fully informed, thoughtful observer that Ms. Sedwick actually harbored strong and lasting personal animosity against Kohring.

It is true that Kohring and Ms. Sedwick held differing views on what constituted good public policy with respect to certain aspects of the operation of state government. It is also clear that some legislative aids may equate differences of political opinion with feelings of personal animosity, but that merely reflects the mind-set of the legislative aides. That some people hold such views does not mean that they have a significant impact on the analysis here. It is, after all, quite possible to have a contrary view of public policy without developing hatred toward those who hold a different view. Any thoughtful person would recognize this to be both true and essential to the political process. A person who was fully informed, meaning one who among other things had listened to the entirety of the cassette tape submitted by Kohring, would conclude that

---

[62] Kohring Statement, ¶ 28.

[63] Exhibits U, V, and W to defendant's reply at Docket Nos. 166-22, 166-23, and 166-24, respectively.

Ms. Sedwick and all the Legislators involved in the discussion of the budget issues of concern to Kohring and Ms. Sedwick have displayed a considerable ability to disagree on the substance of issues without expressing or involving any personal likes or dislikes toward one another.

Although Kohring was quoted in the February 5, 2008 edition of the Anchorage *Daily News* as characterizing Ms. Sedwick as "my worst political rival and enemy,"[64] there is absolutely nothing in the record to support such remarkable hyperbole. Ordinarily, rivals compete with one another. Kohring and Sedwick never did. He was an elected member of the legislative branch. She was an appointed member of the executive branch. There is no evidence that Ms. Sedwick ever published a single derogatory or disparaging remark about Kohring, campaigned or helped someone else campaign against him, campaigned for or helped someone else campaign for a rival candidate, or advocated Kohring's electoral defeat in any fashion. When everything is considered, all that has been shown is that Kohring and Ms. Sedwick had differing opinions of what was in the best interest of the state as reflected in a disagreement over budgetary matters and the effect of the proposed merger of DCED and DCRA.

The court concludes that given all the circumstances, no fully-informed, thoughtful person would see the situation for anything other than this: Ten years ago, Kohring and Ms. Sedwick held different views of what was in the public interest with respect to the budgeting for and operation of certain state departments. Objectively viewed, there was no personal animosity, but rather a difference of political opinion. Finally, even if one could somehow assume that Ms. Sedwick harbored some personal antagonism or hostility during the 1997–99 period, there is no basis upon which an informed and thoughtful person could possibly conclude that the ill-will was so pervasive and deep-seated that it has lived on for nearly a decade.[65]

---

[64] Accessible on line at http://www.adn.com/front/story/305180.html.

[65] Kohring argues in his reply brief that the fact Ms. Sedwick attended the final arguments in the trial is indicative of a continued harboring of resentment. A far more reasonable and thoughtful interpretation would be that the substantial publicity about the trial simply piqued her curiosity. Among other things which a reasonable person would conclude might have piqued that curiosity are the fact that the local newspaper had run stories describing

-24-

**b. Other Factors Which Might Display Bias or Partiality**

Aside from the extra-judicial factors discussed above, the evidence of bias or partiality upon which Kohring relies arises from rulings made during the trial. As noted above, the Supreme Court in *Liteky* held that judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. Only in the rarest circumstances can a ruling establish the degree of favoritism or antagonism required. Rulings may provide grounds for appeal, but they do not support recusal. Furthermore, under *Liteky*, opinions formed and judicial remarks made during the course of a trial that are critical, disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge unless they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. The court will examine the challenged rulings against that standard.

1. <u>Vacation Comment</u>. On October 1, 2007, counsel for defendant filed a notice of non-availability between October 3 and October 10, 2007. The United States filed a superceding indictment on October 3 and set arraignment on October 9.[66/] Defendant's counsel complains that when he brought this to the attention of the trial judge, the undersigned commented to the effect that counsel in Alaska do not take vacations the week before trial. This is a classic example of the kind of comment that is not indicative of bias: it is merely an expression of impatience, dissatisfaction, or annoyance.[67/]

2. <u>Rescheduled Pretrial Conference</u>. Kohring complains that the court advanced the final pretrial conference without seeking input from or consulting with the lawyers.

---

defense counsel as an outstanding criminal defense lawyer from Seattle who claimed successful defenses in difficult cases, the fact that the press reported the case was being prosecuted by special government attorneys from Washington, D.C., the fact that the press had played up the relationship between the prosecution of Kohring, and an investigation potentially involving many persons well known in the community, among them someone so prominent as United States Senator Ted Stevens.

[66/] The record shows that the arraignment date was set by the magistrate judge, not the United States Attorney.

[67/] *Liteky v. United States*, 510 U.S. at 555.

How this decision, which affected both parties, could be indicative of bias against Kohring or lack of impartiality is inexplicable.

3. <u>Motion to Dismiss Indictment (Sen. Dyson as Government Agent)</u>.  The court denied Kohring's motion to dismiss the indictment for prosecutorial misconduct as untimely and on the merits without granting him the requested evidentiary hearing.[68/] The court found no reason to hold an evidentiary hearing and, even at this stage, Kohring has not provided anything which would support the conclusion that such a hearing was necessary.  This ruling exemplifies the kind of trial court action which may be an appropriate subject for an appeal.  It is not evidence of bias.  Kohring also complains about the order being "strongly worded" and "forceful" in characterizing the motion as "untimely" and appearing not to have been made in "good faith."  This might reflect dissatisfaction or annoyance with counsel's performance.  It is not indicative of bias.[69/]

4. <u>Denial of Motion for Change of Venue</u>.  Other than to refer to the fact that the court denied this motion, Kohring advances no argument as to why it shows bias or partiality.  Moreover, this is, as the Supreme Court has noted, a ruling made on the merits of a motion during the course of the proceedings which is not an indicator of bias or partiality.[70/]

5. <u>Denial of Motion to Suppress</u>.  In referring to this order, Kohring simply describes it as being "quite unusual," but makes no argument that it was the product of bias or partiality.  This, too, is a ruling on the merits of an issue made during the course of the proceedings; it is not indicative of bias or partiality.[71/]

---

[68/] Docket No. 108.  The Court notes with some measure of displeasure that in the motion at bar, it is now claimed that defense counsel had no knowledge that Sen. Dyson was acting as a government agent until September 27, 2007.  This claim is belied by the motion itself, which indicates that counsel was alerted to the possible involvement of Sen. Dyson as early as June and certainly by the exchange of e-mails between Sen. Dyson and counsel's office on August 6, 2007, copies of which were appended as an exhibit to the motion.

[69/] *Liteky v. United States*, 510 U.S. at 555.

[70/] *Id.*

[71/] *Id.*

6.  <u>Closed Hearing</u>.  The Government filed under seal a motion *in limine* to bar Kohring from introducing or using certain evidence in cross-examination.  Kohring claims that the court erred in holding a closed hearing on the motion over his objections, and did not provide adequate or proper justification for holding the closed hearing.  Kohring argues that as a result of that closed hearing an order limiting the scope of defense counsel's cross-examination of two government witnesses, Allen and Smith, was issued.  How the holding of a closed hearing over the objections of defense counsel, even assuming the court erred in holding a closed hearing, is indicative of bias is unexplained.  Lacking from Kohring's argument is any claim that the rulings that emanated from the closed hearing were the product of or evidence of bias or a lack of impartiality.

The court concludes that, whether taken individually or collectively, the rulings of which Kohring complains do not meet the high standard set by the Supreme Court that they "display a deep-seated favoritism or antagonism that would make fair judgment impossible."[72]  Finally, even though the challenged rulings are made in a case where the defendant has also pointed to alleged extra-judicial factors, the very weakness of the extra-judicial factors argument dooms any attempt to turn ordinary rulings made in the course of the trial process into evidence of bias or partiality.

### c.  Future Proceedings

Although not specifically raised by Kohring, the court addresses, *sua sponte*, whether recusal from imposing sentence is necessary under § 455(a).  The court concludes that recusal is not appropriate.  The briefing filed on behalf of Kohring contains argument that includes comments which could reasonably be construed as impugning the integrity of the trial judge.  Were these comments made by Kohring himself, they might lead a reasonable person to question the judge's ability to remain impartial.  However, the comments in Mr. Browne's arguments are attributable solely to him, not to Kohring.  Consequently, any ill feeling that might be thought to attach to the comments would be directed at defense counsel, not Kohring.  In similar circumstances,

---

[72] *Id.*

Case 3:07-cr-00055-RRB   Document 176   Filed 04/14/08   Page 27 of 29

the Ninth Circuit has explained:[73] "Criticism from a party's attorney creates an even remoter danger that a judge will disqualify himself because the federal recusal statutes, in all but the most extreme circumstances, require a showing that the judge is (or appears to be) biased or prejudiced against a party, not counsel." This case does not present such extreme circumstances. The court considers the defense motion practice to be an attempt by defense counsel to explore every possible avenue in representing his client. Perhaps Mr. Browne's efforts might be thought overzealous, but the simple fact is that trial practice is no place for people with thin skins, be they advocates or judges. A thoughtful person fully informed about the robust rough and tumble of litigation would not conclude that the assigned judge would be biased against Kohring, even if it were reasonable to conclude that Mr. Browne stepped outside the boundaries of proper conduct.

It is also appropriate to consider the consequences of too readily investing a lawyer's zealous advocacy in a recusal motion with the power to divest the assigned judge of the opportunity to complete a judicial proceeding. Doing so here would eliminate the ability for the sentencing judge to use the information and perspective uniquely available to the judge who sat through the trial just when the time has come to fashion an appropriate sentence that takes into account all the factors set out in 18 U.S.C. § 3553(a). It may be added that a practice endorsing a recusal request made in circumstances such as those present here would effectively transfer a significant measure of control over the district court docket and judicial assignment process to counsel for one of the parties. The court sees no basis for recusal from the sentencing proceeding.

### C. Dismissal of Charges

In the motion at docket 155, Kohring also asks that the charges against him be dismissed. His argument for dismissal rests on the premise that dismissal is required

---

[73] *Standing Committee on Discipline of U.S. Dist. Court for the Central Dist. of California v. Yagman*, 55 F.3d 1430, 1444 (9th Cir. 1995); *see also United States v. Burt*, 765 F.2d 1364, 1368 (9th Cir. 1985) ("Personal bias or prejudice must be against the party, not the attorney for the party.").

-28-

because the trial judge should have recused and that the failure to recuse constituted "structural error."[74]  There is no need to consider whether a failure to recuse is "structural error, because the court has concluded that there was no need to recuse. The request to dismiss the charges against Kohring will be denied.

## VI.  CONCLUSION AND ORDER FOR SENTENCING

For the reasons set out above:

1.  Defendant Kohring's motion at docket 155 is **DENIED**;

2.  Defendant Kohring's motion at docket 167 is **DENIED**;

3.  Plaintiff United States's Motion at docket 173 is **DENIED** as moot; and

4.  The court will conduct a sentencing hearing on May 8, 2008, at 9:30 AM.

DATED at Anchorage, Alaska, this 14th day of April 2008.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[74] Docket No. 155 at pp. 13-14.