**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | |
| **VICTOR H. KOHRING,** | Case No. 3:07-cr-00055-JWS |
| Defendant. | |

## GOVERNMENT'S RESPONSE TO KOHRING'S MOTION TO DISMISS, OR IN THE ALTERATIVE, FOR AN ORDER GRANTING A NEW TRIAL

On June 10, 2009, the Ninth Circuit charged this Court with determining: "(1) whether the government breached its obligation of full disclosure under *Brady* [*v. Maryland*, 373 U.S. 83 (1963),] and *Giglio v. United States*, 405 U.S. 150, 154 (1972); (2) if so, whether the defendant was prejudiced by the violation; and (3) if the defendant was prejudiced, what the remedy should be." *United States* v. *Kohring*, 9th Cir. No. 08-30170 (Doc. 41).  Defendant Victor Kohring has now asked this Court to vacate his convictions and dismiss the indictment, or in the alternative, for an order granting a new trial.  Doc. 269.  For the reasons set forth below, however, Kohring has not established a constitutional discovery violation warranting a new trial, much less dismissal.  This Court should therefore deny Kohring's motion.

## I.    INTRODUCTION

A jury convicted Kohring of three public corruption-related felony counts after being presented with several incriminating audio and video recordings, including one video capturing him approaching Bill Allen in the heart of the legislative session and asking for $17,000.  In his motion, Kohring scarcely mentions this evidence, and instead asserts that he is entitled to a new trial or

dismissal based on bits of information he has selectively picked from the prosecutors' files.  As we explain below, in light of the incriminating recordings, none of the information produced post-trial about which Kohring now complains would have affected the jury's verdict.  Furthermore, each item focused on by the defendant was either in fact disclosed to him, merely cumulative to other information known to him, inadmissible at trial, or so immaterial when considered in the full context of all the evidence against Kohring, that there is no reasonable probability that, had it been disclosed, it would have made a difference in the jury's verdict.  As a result, there are no grounds under either *Brady* or *Giglio* to discard the jury's verdict and require a new trial.

The government does not dispute, however, that some of the information Kohring identifies was favorable to him, and that while it was not material — as this Court has already found in *United States* v. *Kott*, 3:07-cr-056, Doc. 429 — prudence dictates that it should have been provided to him before trial.  Indeed, it is clear that there were regrettable missteps in this case with respect to discovery.  Beyond the narrow confines of this case, the missteps here and in other cases have had a nation-wide effect.  As a result, the Department of Justice has taken significant steps to improve training for all federal prosecutors, has mandated written discovery policies in each United States Attorney's Office and litigating Division, and has established discovery points of contact both at headquarters and in each Office, to help monitor and improve routine practices nationwide.

Nevertheless, as in *Kott*, the mistakes in this case do not warrant either a new trial or, more drastically, dismissal of the indictment.  The focus of a materiality analysis under *Brady* is "whether[,] [in the absence of the undisclosed information, the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles* v. *Whitley*, 514 U.S. 419, 434 (1995).  Thus, while the government accepts responsibility and represents to this Court its regret

and commitment to improvement, it nevertheless contends that under the law and the facts of this case, Kohring received a fair trial and the jury's verdict should stand.  *Cf. United States* v. *Lloyd*, 71 F.3d 408, 410 (D.C. Cir. 1995) ("The purpose in *Brady* is not to punish a wrongdoing prosecutor, but rather to assure that the defendant was not convicted without due process of law.").

## II.    APPLICABLE LAW

In *Brady* v. *Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In *Giglio*, the Supreme Court extended this principle to include evidence that impeaches a witness's credibility.  405 U.S. at 154; *Silva* v. *Brown*, 416 F.3d 980, 985, 988 (9th Cir. 2005). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States* v. *Bagley*, 473 U.S. 667, 682 (1985).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  *Id.*; *see also id.* at 678 (conviction should be reversed "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial").

In cases decided since *Brady*, the Court has explained its limits, emphasizing repeatedly that the relevant focus is to be whether the nondisclosure of particular information resulted in the denial of a fair trial by undermining confidence in the reliability of the jury's finding of guilt.  For example, in *United States* v. *Agurs*, 427 U.S. 97 (1976), the Court emphasized as a "critical point" that "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial."  *Id.* at 108.  The

Court further explained that, because "[t]he proper standard of materiality must reflect our overriding concern with justice of the finding of guilt," a prosecutor's failure to disclose exculpatory evidence violates the Constitution only "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id*. at 112. The Court emphasized that "there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor." *Id.* at 106. The *Agurs* Court expressly rejected the notion that a trial court should set aside a conviction where "the error did not influence the jury, or had but very slight effect." *Id.* at 112.

The facts of *Agurs* make it clear that the Supreme Court meant what it said; in that case, the female defendant was charged with stabbing a male companion with whom she had enjoyed "a brief interlude," and her defense was that she had been attacked by the victim and acted in self-defense. *Id.* at 98-100. Agurs discovered after trial that the victim had two criminal convictions for assault involving knives. *Id.* at 100-01. Nevertheless, the Supreme Court agreed that the evidence was not material because after a "thorough and entirely reasonable" appraisal of the entire record, the district court "remained convinced of [Agur's] guilt beyond a reasonable doubt." *Id.* at 114.

Similarly, in *Bagley*, the Court considered and rejected the expansion of *Brady* to reach nonmaterial, inadmissible information. The Court explained that the purpose of the *Brady* rule "is not to displace the adversary system . . . but to ensure that a miscarriage of justice does not occur." 473 U.S. at 675. For that reason, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Id.* A rule that *all* information favorable to a defendant must be disclosed, regardless of its materiality or admissibility, "would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." *Id.* at 675 n.7. The Court

then reiterated that "[c]onsistent with our overriding concern with the justice of the finding of guilt, a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Id.* at 678 (citation and internal quotation marks omitted).

Again, the facts of *Bagley* are telling with respect to clarifying the Court's standard; *Bagley* was a *Giglio* case in which the government's agreement to pay two of its witnesses for their cooperation was not disclosed. *Id.* at 676. Even in such a case, the Court held, the information is not material unless there is a reasonable probability that had it been disclosed, the jury's verdict would have been affected.

Subsequently, in *Kyles* v. *Whitley*, the Court explained that "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." 514 U.S. at 436-37. A constitutional violation occurs only "when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* at 434 (citation and internal quotation marks omitted). Thus, the fact that information might be "favorable" to the defense, or that the defense might be able to make some use of it in cross-examination is only the beginning of the analysis; the issue is whether the information is so significant that the fact the defense was unable to make use of it actually undermines confidence in the jury's verdict. As the Court observed in *Strickler* v. *Greene*, 527 U.S. 263 (1999), there is "never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281.

Because materiality is defined by measuring the degree to which suppressed evidence "undermine[s] confidence in the outcome," *Bagley*, 473 U.S. at 678, a materiality analysis typically

5

demands that the probative value of the suppressed evidence be weighed against the government's evidence at trial, because the stronger the government's evidence is at trial the less probable it is that suppressed evidence favorable to the accused would have affected the jury's verdict. *See Agurs*, 427 U.S. at 112-13 ("[T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about the guilt whether or not the additional evidence is considered, there is no justification for a new trial."). In cases where the Supreme Court or the Ninth Circuit have overturned a verdict based on a *Brady* violation, the Courts have attached considerable significance to the weakness of the government's evidence, which made the issue of guilt a close call at trial. *See, e.g.*, *Kyles*, 514 U.S. at 454 ("This is not the 'massive' case envisioned by the dissent; it is a significantly weaker case than the one heard by the first jury, which could not even reach a verdict.") (citation omitted); *United States* v. *Chapman*, 524 F.3d 1073, 1080 (9th Cir. 2008) ("[T]he government's case to date had been quite weak . . . ."); *id.* at 1087 ("[T]he case as originally prosecuted appeared to the district court to have been faltering."); *United States* v. *Kojayan*, 8 F.3d 1315, 1322 (9th Cir. 1993) ("This case was close, and we find a 'reasonable probability' that, had this evidence been disclosed, the result would have been different; the evidence was therefore material."); *see also id.* at 1323 ("This was a close case: The jury deliberated for over two days after a one-and-a-half-day trial.").[1]

While a *Brady* analysis requires a court to view suppressed evidence "collectively," *Hein* v. *Sullivan*, 601 F.3d 897, 906 (9th Cir. 2010), and to evaluate it "in the context of the entire record," *Agurs*, 427 U.S. at 112-13, a *Brady* analysis nonetheless must proceed count by count. *See e.g.*,

---

[1]  The overall strength of the evidence against Kohring will be detailed later, but it is worth noting that the jury had no difficulty reaching its verdict in this case; following an eight-day trial, it deliberated for just over a day before returning its verdict.

*United States* v. *Johnson*, 592 F.3d 164 171 (D.C. Cir. 2010) ("A *Brady* violation with respect to the defendant's conviction on one count does not necessarily affect his conviction on any other count.").  For each count, then, a court must evaluate each of the three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

### III.   SUMMARY OF THE EVIDENCE AT TRIAL AND THE JURY'S VERDICT

The case against Kohring was based on evidence that Kohring had a corrupt relationship with Bill Allen, and included evidence that Kohring received cash payments and other financial benefits from Allen in exchange for official acts benefitting VECO, including working to pass the PPT.  The government does not dispute that in this case, as this Court found in the *Kott* case, "Allen's testimony was a major part of the government's case." *United States* v. *Kott*, Doc. 429, at 12. However, as was the case in *Kott*, there was other ample evidence to support the convictions in addition to Allen's testimony, foremost being "the most significant evidence . . . [the] audio-visual recordings of activities in Suite 604 of the Baranof Hotel in Juneau, whence Allen and Smith orchestrated the effort to control the outcome of legislative action on the PPT." *Id.* at 2.  Certainly, the most powerful evidence at trial was the March 30, 2006, video recording showing Kohring in Suite 604 asking Allen for $17,000, receiving cash in hand from Allen, and barely having finished stuffing the cash in his pocket before asking how he could help Allen to pass the PPT bill.  In addition, Kohring's own admissions to the FBI corroborated much of Allen's testimony.

7

A.      **Background of Kohring's Relationship with Allen**

In 2006, the Alaska legislature was considering legislative proposals to encourage development of a natural gas pipeline.  Tr. 4:23-31, 5:114.  The success of that venture held the promise of hundreds of millions of dollars of revenue for Allen's company, VECO.  Tr. 4:116.  As a result, Allen and Rick Smith spent the entire 2006 legislative session in Juneau, seeking to influence the passage of legislation affecting the pipeline.  Tr. 4:31, 5:114.  They targeted several key legislators to assist their efforts, including Kohring and Kott.  Tr. 4:34-36, 6:58-59.

Kohring had been cultivated by Allen for several years.  Tr. 4:50, 5:115-118, 123.  Allen testified that starting in 2002, he had made a number of cash payments to Kohring to help him out when Kohring ran short of cash; Kohring was chronically short of money.  Tr. 5:123-124; Tr. 6:62.  The indictment charges that Allen made "several" such payments, between $500 and $1000 each time; Allen testified specifically about three separate occasions.  Tr. 5:123-127.  Smith likewise testified that he knew Allen was making payments to Kohring prior to 2006, and that they were intended to buy influence with him.  Tr. 4:49-50.  Although the rules of the legislature required disclosure of all gifts, Kohring never filed a gift disclosure form about any these payments.  Tr. 12:64-66.

While lining Kohring's pockets, Allen asked Kohring for help and official action on a number of issues, ranging from firing an aide that had incurred Allen's displeasure, Tr. 5:132-135, to not running for a Senate seat against an Allen ally, *id.* at 131-132, to stalling a bill in Committee, *id.* at 128-130.  The indictment did not charge and the government made no effort to prove that any specific payment was directly linked to any specific legislative act, and the pre-2006 events do not constitute substantive charges in the indictment of Kohring; rather, they are incorporated as part of

8

the conspiracy charge, providing background about the development of the corrupt relationship among Kohring, Allen and Smith, leading up to the events of 2006.

**B.      The Events of 2006 and the Surreptitious Recordings**

At trial, the jury heard testimony and listened to a number of surreptitious audio and video recordings demonstrating Kohring's corrupt relationship with Allen and Smith in 2006.

Kohring's legislative posture was strongly anti-tax.  Tr. 4:57, 6:33.  However, in 2006 the passage of legislation to facilitate the building of the gas pipeline required the passage of a tax bill, and Allen was worried that Kohring might balk.  Tr. 5:118.  Allen testified that a few days after the PPT bill was introduced, he and Smith were worried about Kohring, because Kohring did not want to support any tax and he was angry that the bill was not introduced through the House Oil and Gas Committee, of which Kohring was the chair.  *Id.* at 5:118-122.

The government played a telephone conversation between Smith and Kohring, recorded on February 21, 2006, after the PPT tax bill had just been introduced in the Alaska legislature.  *See* Gov't Exh. 2a.  In the conversation, Kohring discussed how supporting the PPT would go against his anti-tax philosophy.  Smith responded saying, "I know your philosophy[,]" and "[p]ersonally I agree 100 percent with you on those issues[,]" but he also told Kohring to "stay with the program" and warned Kohring, "don't you dare take this as an opportunity to go crazy. . . . To go wacko."  *Id.* at 7.  Kohring replied that he would "reluctantly go along," saying "I don't want to screw you guys over nothing, that's for sure, and hurt you guys."  *Id.* at 8.  During the conversation, they made plans to meet two nights later on February 23, 2006.  *Id.* at 11-12.

1.      *The Island Pub Dinner and the Following Weeks*

Two nights later, the scheduled meeting took place at the Island Pub restaurant.  In a recording of a subsequent telephone conversation, on March 1, 2006, Kohring called Smith to thank him for "that nice dinner the other night."  Gov't Exh 3a, at 6.  Allen testified about what happened at the "nice" dinner.  Tr. 5:118-121.  He testified that Rick Smith "took off and had a cigarette or something" and that, during Smith's absence, Allen gave Kohring $1000.  *Id.* at 121.  Smith testified that he left the dinner table because he had "a feeling that [Allen] wanted to give Vic some cash," and he "didn't want Vic to know that [Smith] knew that . . . he might get some cash."  Tr. 4:47.

This testimony was corroborated by the recording of Allen and Smith talking about the Island Pub dinner in Suite 604 of the Baranof Hotel on March 4, 2006.  Both men had been drinking, and they were discussing that they had to "get dirty" and "kiss ass" "to produce" for their clients.  Gov't Exh. 4a, at 2-3; *see also id.* at 4 (Allen saying, "I don't make a f[---] who you gotta kiss anybody's ass.  Pete Kott, or who's ever ass, we gotta f[---]in' do it.").  Allen offered Smith an "example" of getting dirty to produce — the Island Pub dinner a week earlier where he had given Kohring $1000:

> Allen:          You know, just like ol' Vic the other night.
> Smith: S – who?
> Allen: Vic Kohring.  Vic Kohring.
> Smith: I know.
> Allen:          You know, you – take off and – I gave him a – a – a thousand.
> Smith: Well, you told me you, ah – that's why I left you.
> Allen: I know you did.  I know you did.  But that's what I – you know, that's what I gotta do.
> Smith: I know.  That – that's the reason I left you guys alone!
> Allen: I know you did!  I f[---]in' know that!  I'm just givin' you an example.  And he wo – he – he would kiss our ass. . . .

*Id.* at 5.

Also during dinner at the Island Pub, Kohring asked Smith about the possibility of a summer job for his nephew.  Tr. 4:89-90.  Smith told Kohring about VECO's internship program, and encouraged Kohring to have his nephew apply.  *Id.* at 90-91.  Smith testified that he mentioned the job to Kohring because "[Kohring] was important to us in Juneau and we were hoping that [he] would continue to support our – political issues as we saw them."  *Id.* at 90.

Over the next month, Kohring was in constant contact with Smith, discussing the things he could do for Smith and Allen to advance the bill.  Tr. 4:59-62.  He offered to lobby other legislators on behalf of the bill, *id.* at 53, 59-62, he agreed to put in modifications to the legislation that might ease its passage, *id.* at 54, he agreed to raise points in caucus discussions, *id.* at 53, and he offered to pass on inside information about the legislature's deliberations, *id.* at 59.  The confidence Allen and Smith had that Kohring would indeed "kiss their ass" is demonstrated by a recorded conversation on March 20 among Allen, Smith and Pete Kott, in which Kott expresses concern about Kohring's rigid anti-tax history, pointing out that he had not "voted for a tax bill since  he was born."  Gov't Exh. 6a, at 3.  Smith reassured Kott that Kohring was on board, and would vote for the bill.  *Id.*

Also during the following month, Kohring called Smith again about a job for his nephew. Tr. 4:90-92.  Smith asked for a copy of the boy's résumé, and then forwarded it to VECO's headquarters, without even making an effort to hide the reason he wanted him hired: "He's Rep. Vic Kohring's nephew."  *Id.* at 91-94.  VECO hired Kohring's nephew, despite his youth and inexperience, and he went on to earn over $3000 for his summer's work.  *Id.* at 95-98.

## 2.   *Kohring's $17,000 Solicitation (Count Three)*

One of the strongest examples of Kohring's corruption, his solicitation of $17,000 from Allen and Smith, was captured entirely on videotape and provided the factual basis for Count Three ("Attempted Interference With Commerce By Extortion Induced Under Color of Official Right"). The day before the solicitation, Kohring explained to Smith in a recorded phone call that he was "very tired and getting kinda stressed" from his work as a legislator.  Gov't Exh. 10a, at 1-2. Kohring then mentioned various VECO employees that he had recently met who lived in his legislative district.  *Id.* at 3-4.  Finally, he asked Smith whether he could drop by the next day to discuss with Allen and Smith "a relatively serious matter."  *Id.* at 5.

The video recording of the meeting the next day in Suite 604, revealed to the jury that Kohring approached Allen — in the heart of the legislative session — and asked Allen for $17,000 to pay off his credit card debt.  Gov't Exh. 11a.  Kohring began the conversation by saying that he had a "situation . . . it's a financial matter" that he thought "potentially, could hurt [him] politically." *Id.* at 2.  Kohring described the $17,000 credit card debt as "potentially . . . a court situation . . . gone to collections," and that he was "worried" "it could hurt [him] politically, it will be a public record, and [he did]n't want there to be any – any evidence of any public issue goin' on."  *Id.*

Kohring then explained why he was coming to Allen and Smith:

> So what I wanted to do is ask you guys, ah, for your, um, recommendations as to how I can deal with this.  And I wanted to suggest – a couple of, ah, things, with all due respect, and, please don't feel like I'm applying any pressure.  I come to you guys 'cause you're friends. . . . and I was wondering if there'd be a possibility of perhaps, ah, doin' some kind of a project, ah, to – to make some money with you guys, or you can refer me to somebody that could help me with that.  Or, as another option, maybe you could help me with, ah, some financing, like a modest loan, or something, so I can get this paid off and have it behind me, and then get it paid off to you folks, or to whoever you can help me with. . . .

*Id.* at 2-3.

Kohring further explained that with his "legislative salary," he was just "livin' paycheck-to-paycheck." *Id.* at 4.  He also claimed that he was "not tryin' to come to the well": "I'm only – only here just to, ah, ask if you guys would, ah, consider helping me and suggest some options to me as to what could be done." *Id.* at 4.  Smith, Allen, and Kohring then discussed a variety of options. Kohring acknowledged that he would have to be "discreet" because of the Alaska Public Offices Commission and the "criticism . . . because of [their] relationships, and all that." *Id.* at 4-5.

After Smith and Allen asked for a little time "to chew on it," Kohring claimed, "and, I – I wanna do everything, ah, completely above board, of course. . . I don't want anybody gettin' in any kind of hot water, or get criticized by . . . anybody. . . [A]nd, again, please don't feel like I'm abusing my relationship with you guys." *Id.* at 6.  Kohring also later offered that he "would make sure that everything was, ah, done in accordance to law too":

> I would research that, as well, and I could present a hypothetical scenario to say that
> – ethics committee, and they give ya' a private confidential response.  But, again, it
> would be completely hypothetical without any names mentioned, or anything, so.
> So nobody would . . . know who I'm associated with.  But, ah, I would do that, just
> to make sure everything is done in accordance, ah, with law, so nobody gets, ah,
> embarrassed later down the road.

*Id.* at 11.  Allen balked at the suggestion that Kohring would consult the legislative ethics advisor and remarked, "I don't know if that's real smart."  In response, Kohring quickly withdrew the suggestion:  "Yeah, it might be better for me to simply to, ah – to research the statute and just come to – draw to a conclusion of some kind. . . . No red flags are raised, right?" *Id.* at 12.

Kohring and Allen then discussed possible job opportunities with VECO that would allow Kohring to earn money to pay off his debt.  Kohring stated that he was not after "any freebie" from Allen: "I would wanna make sure, Bill, that, ah, if you did have me do something for it, that it was,

ah, something you truly can benefit from – from me. . . . I'd have to bust my butt." *Id.* at 14.

Kohring said, "I want it to be above board, and. . . . I don't want anybody to ever criticize our

relationship and imply that somehow you're givin' me some big benefit . . . that I don't deserve."

*Id.* at 15.

### 3.    *The "Easter Egg" Payment*

Immediately following the discussion about Kohring's $17,000 credit card debt, Allen and

Kohring began discussing the upcoming Easter holiday.  Kohring mentioned that it was the first

Easter he would spend with his daughter, and when Allen suggested that Kohring get some Easter

eggs for her, Kohring interjected, "With money in it?"  Gov't Exh. 11a, at 18.  Allen said, "yeah"

and then turned to Smith and asked him whether he had any "hundreds." *Id.*  Smith replied, "Yep."

*Id.*  Allen then handed several bills to Kohring.

Kohring next mentioned that he had just sent money to his daughter's mother to buy a Girl

Scout uniform, along with a card and "20 bucks." *Id.* at 19.  Allen replied, "All right.  Well, then,

let me – let me help you on – on that little, ah . . . on her little uniform." *Id.*  Allen then handed more

cash to Kohring.  The video clearly depicts Allen twice handing several bills to Kohring, although

the actual amount of money is not clear from the video.

Immediately after Allen gave Kohring the cash, Kohring stuffed the bills into his breast

pocket and looked over his left shoulder before leaning in slightly and asking, "What can I do at this

point to help you guys?  Any – anything? . . . Just keep lobbying my colleagues for a governor's,

ah, plan, right?"  Gov't Exh. 11a, at 20.  Allen, Kohring, and Smith then discussed whom Kohring

should try to lobby about the PPT, how he should go about it, and how he would report back to

Smith and Allen.  Kohring then explained his plan: "My first effort will be to figure out where

they're at, and then secondly, I'll politely and gently and carefully as I can, to influence them, ah, in a positive way to see that the governor's bill is the vehicle that they consider." *Id.* at 22. Kohring also explained that he would do this for Allen and Smith despite his anti-tax position. *Id.*

The following day, Kohring left Smith a voicemail updating him on what Kohring was doing to carry out the plan they had made in Suite 604 the previous day. *See* Gov't Exh. 12a, at 2 ("[A]s far as, uh, meeting with, uh, House Finance members that I mentioned I would, uh, do. I mentioned this to you and Bill yesterday. I have . . . scheduled appointments for me to meet individually with House Finance members to encourage, uh, them to consider . . . passage of [the bill] that's as close to the Governor's version as possible. So, anyway, just wanted to make those, uh, give you that report. . . ."). A few hours later, Kohring called Smith again, reaching him this time, to provide Smith another update. *See* Gov't Exh. 13a ("I just want you to, uh, let you know I'm, uh, doing what I can to help you guys out over here. I know you're concerned about the, uh, what's happenin' on the Senate side with that PPT thing and, uh, I will do the best I can as one legislator here to, uh, lobby, uh, for the Governor's bill.").

### 4.    *The McDonald's Payment*

On June 8, 2006, the final day of the special legislative session for passing the PPT, the legislature was going to pass a tax rate at 22.8%, a result unacceptable to VECO. Tr. 4:98-99, 5:153. With only a few hours left before the final vote was set to occur, Allen, Smith and Kott met in the hotel suite to try to think of a way to stall the final vote. Tr. 4:99-100; Gov't Exh. 21a. Allen had come up with a plan to persuade Kohring to leave town so that he wouldn't be present, in an effort to stall the vote. Tr. 4:100. He called Kohring to arrange a meeting at the McDonald's in Juneau to "just take off." Gov't Exh. 21a, at 2.

Before Allen left to meet Kohring, though, Smith and Kott persuaded Allen that the plan wouldn't work. *See, e.g.*, Gov't Exh. 21a ("KOTT: It'll just get Vic in trouble for dodgin' a vote."; "SMITH: And it'll be . . . Bill Allen and Vic drivin' away from McDonald's."). Allen went to fetch Kohring and bring him back to the hotel suite. Tr. 5:160. The two bought food at McDonald's and walked back to the hotel together. *Id.* Allen testified that on the walk back to Suite 604, he gave $600-$700 "to Vic right there by the liquor store." *Id.* at 160-61.

When they arrived back at the hotel, the men continued their discussion about the pending vote on videotape, which showed Allen and Kohring entering Room 604 on June 8, 2006, with food from McDonald's. Gov't Exh. 21a. After discussing with Kott and Allen how Kohring might have gotten in "trouble" for trying to stall and kill the bill, Kohring said to Allen: "But I want you to know, I – I would have done, ah, what you requested Bill. . . . I would have helped – I would have helped you out. Really." *Id.* at 6-7.

**C.    Other Evidence**

*1.    Kohring's Statements to the FBI*

At trial, the jury heard evidence that on August 31, 2006, Kohring's office was searched pursuant to search warrant, and Kohring agreed to be interviewed. Tr. 12:71-95. When federal agents asked Kohring if he had taken money or other things of value from VECO, Allen or Smith, Kohring conceded that he had done so. *Id.* at 74. He said that he had asked for and received money and other things, both for his own personal benefit and also for campaign contributions. *Id.* at 74-75. Pressed about what he meant when he said that he had asked for money for himself, he responded that he "preferred . . . to think about that question further." *Id.* at 75.

16

Later in the interview, Kohring acknowledged receiving what he called "personal gifts" from Allen, "in the range of maybe hundreds of dollars[,]" and that he "had not kept track" of the total amount. Tr. 12:75.  He conceded that he had asked Allen for "some sort of strategy" to help him pay off his credit card debt of $17,000, and that he was afraid that if he went to a financial institution instead the publicity would "affect his political standing."  *Id.* at 76.  He also conceded that at the same time, Allen and Smith had given him "some money for his daughter," but claimed that it was only about $100.  *Id.* at 77.  In contrast to his earlier concession that he had received "gifts" totaling "maybe hundreds of dollars," Kohring then claimed that this gift for his daughter was the only time he had received cash from Allen or Smith.  *Id.*  He also claimed that it was his impression that these "gifts" were given to him out of friendship.  *Id.* at 83.[2]

### 2.      *Alaska State Public Disclosure Requirements*

The administrator for the Select Committee on Legislative Ethics testified that part of the job of the Committee staff was to give advice, both formal and informal, to legislators with questions. Tr. 12:51-54.  She explained that while legislators may accept gifts that are related to their legislative status of up to $250 total within a calendar year, no gifts at all are permitted from lobbyists during the legislative session, with the limited exceptions of food or beverage for immediate consumption, and tickets to approved charity events. *Id.* at 60-62.  If not related to the legislator's legislative status, the legislator may accept gifts cumulating over $250, but such gifts must be disclosed, with an explanation of why the gift was unrelated to the legislator's position.  *Id.* at 62.

---

[2]  Kohring also conceded that he had asked Allen for a job for his nephew, and that the job was a "great deal" for the boy because he was paid $16 an hour.  Tr. 12:77-78.

She described Kohring as frequently seeking her informal advice on a variety of issues, including whether various gifts he had received required disclosure. *Id.* at 63-64. In fact, Kohring had filed gift disclosure forms detailing gifts of travel and hospitality. *Id.* at 65. However, she testified, he never sought any advice with respect to gifts or payments from VECO, Bill Allen, or Smith, and never submitted any gift disclosure forms with respect to anything received from them. *Id.* at 64-66.

### 3.   *Evidence from Kohring's Computer*

The government also presented at trial evidence from Kohring's office computer. Tr. 12:96-106; Gov't Exh. 109. A search of that computer revealed a list of names entitled the "Red Carpet Club." Tr. 12:98. The list was divided into four categories: "Lobbyists," "Personal Friends," "Supporters," and "Other." *Id.* Bill Allen and Rick Smith were not listed as "personal friends." *Id.* Rather, they were listed as "supporters." *Id.* at 99.

### D.   The Jury Convicts Kohring of Counts One, Three and Four

Based on this evidence, the jury convicted Kohring of Count One, conspiracy to commit extortion and attempted extortion under color of official right and bribery, in violation of 18 U.S.C. § 371; Count Three, attempted interference with commerce by extortion induced under color of official right, in violation of 18 U.S.C. § 1951(a); and Count Four, bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B). The jury acquitted Kohring of Count Two, interference with commerce by extortion induced under color of official right, in violation of 18 U.S.C. § 1951(a), which, as we explain below, was the only count that did *not* charge Kohring's $17,000 solicitation. *See, e.g.*, Tr. 8:28-30.

## IV.   ANALYSIS

Kohring claims that information in the government's possession that was not disclosed to him before trial was favorable to him and that there is a reasonable probability that had this information been disclosed, the jury's verdict would have been different.  He also argues that rather than grant a new trial, this Court should dismiss the indictment because of "egregious, calculated and intentional" discovery violations.  Both of these claims are without merit and should be rejected.

### A.     The Undisclosed Information Was Not Material to Kohring's Convictions

Kohring contends that the government suppressed favorable information and that there is a reasonable probability that if he had this information at trial, the jury's verdict would have been different.  Specifically, he complains throughout his motion about information relating to Allen's memory and inconsistent statements, as well as the following categories of information: Smith's previous statements about the amount of money exchanged in the Easter egg conversation (Mot. 22-23); Allen's relationship with Kohring, including Allen's motivation of friendship and sympathy towards him (Mot. 37-47); the fact that the FBI's surveillance of the Island Pub dinner did not reveal the "transfer" of "financial benefits" (Mot. 32-34); Smith's previous statements about Kohring's state of mind (Mot. 47-49); Smith's relationship with an FBI agent and her impressions about his state of mind (Mot. 49-52); Frank Prewitt's previous statements about whether he thought Kohring was corrupt (Mot. 52-56); and information about allegations of Allen engaging in criminal sexual misconduct (Mot. 56-63).

As we explain below, information concerning Bill Allen's memory was generally cumulative to information known to Kohring, on display at trial, or of minor additional relevance.  Kohring's argument that Rick Smith had stated that the Easter egg payment was only $200 is based on a

misreading of the email at issue, the facts on which Smith's speculation was based were known to the defense, and the entire exchange was on videotape for the jury. His contention that a prosecutor's impressions about his witnesses should have been disclosed is legally insupportable. Information that Bill Allen was motivated in part by friendship and sympathy for Kohring was disclosed to the defense, and Allen was thoroughly cross-examined on the issue. Furthermore, the notion that friendship and pity were the sole reasons for the payments is so implausible in light of the evidence that it could not have influenced the jury. The fact that the surveillance of the Island Pub dinner was unsuccessful was disclosed to the defense. Rick Smith's comments that he did not know Kohring's state of mind were not inconsistent with his testimony and were not exculpatory. Smith's relationship with the FBI agent and her subjective impressions about his state of mind were not appropriate impeachment information and were immaterial. Frank Prewitt's subjective view of whether or not Kohring was corrupt, expressed a year before the central events of this case and without any knowledge of Kohring's $17,000 solicitation, or the exchange of cash and favors between Kohring and Allen, was not relevant and could not have affected the jury's verdict. Finally, information about allegations of sexual misconduct by Bill Allen could not have affected the jury's verdict because, as this Court ruled in *Kott*, it would not have been admitted under the Rules of Federal Evidence, and hence was not material.

Thus, none of the information Kohring cites, whether considered individually or together, supports the argument that there is a reasonable probability that the jury's verdict would have been affected when it is considered in light of all the evidence at trial. That is, even if the information was favorable, it was not material to any of the counts of conviction.

Furthermore, none of this information could remotely impeach or call into question the jury's verdict on Count Three, the underlying facts of which were captured entirely on videotape.  The government's strongest evidence against Kohring has always been the audio-visual recording of Kohring's meeting with Allen and Smith on March 30, 2006, in the Baranof Hotel.  The majority of that 20-minute recording consisted of Kohring asking Allen and Smith for $17,000 to pay off his credit card debt.  At the conclusion of that meeting, Kohring received cash in hand from Allen, after which Kohring immediately began discussing ways in which he could help Allen with the PPT bill. Indeed, that solicitation was the only act charged in Count Three, "Attempted Interference With Commerce By Extortion Induced Under Color of Official Right."

The elements of Count Three, from this Court's jury instructions, required the jury to find unanimously beyond a reasonable doubt that: (1) "during the period between on or about January 2006 and August 2006, [Kohring] attempted to obtain property which he knew he was not entitled to, with [the jury] agreeing on what that property was"; (2) Kohring "knew that the property would be given in return for his agreement or understanding, whether explicit or implicit, for taking some official action"; and, (4) Kohring "did something that was a substantial step toward committing the crime of extortion under color of official right, with [the jury] agreeing as to what constituted the substantial step." Tr. 8:88-8:89.  As the government summarized for the jury in its closing argument, "[t]his [count] specifically relates to that $17,000 request, the payment that [Kohring] was seeking in suite 604." Tr. 8:30.

Again, the transaction underlying Count Three is entirely on videotape, and that tape speaks for itself.  It does not depend on testimony from Bill Allen or Rick Smith.  Allen's credibility as a witness, his memory, and his mixed motive for giving cash to Kohring over the years are immaterial

21

with respect to this count; the only question for the jury was Kohring's corrupt motive in asking for the money, and that question could be answered by the numerous audio and visual recordings, as well as other uncontested evidence, such as Kohring's own statements to the FBI.

It is telling that in the 71 pages of Kohring's motion, one has to search for any mention of Count Three, much less any analysis of how the undisclosed information he complains of might have affected the verdict as to that Count. Instead, the motion seeks to deflect attention from the evidence in Count Three. Kohring points to several overt acts for Count One and things of value for Count Four, such as the Island Pub payment, the Easter egg payment, and the McDonald's payment, that he claims were the "the centerpieces" (Mot. 10) of the government's case. He then spends almost the entire motion focusing on those events. Strikingly, in a summary of the evidence that Kohring claims the government is "left with" without Bill Allen's testimony (Mot. 14), Kohring fails to mention the powerful videotaped evidence capturing his solicitation of thousands of dollars from Allen and Smith in a darkened hotel room during the heart of the legislative session, which is followed by Kohring's receipt of cash and then a discussion as to how Kohring could help Allen and Smith advance their legislative agenda.

The reason for Kohring's decision to ignore this evidence, as well as his refusal to analyze it, should be obvious. When weighed against the information about which he complains, it is clear that Kohring cannot show a reasonable probability that the jury's verdict would have been affected.

Kohring also cannot show a reasonable probability that the jury's verdict would have been affected on Counts One and Four. While we believe that the information about which Kohring now complains was either in fact disclosed to him, merely cumulative to other information known to him, inadmissible at trial, or so minor when considered in the full context of all the evidence against

Kohring, we acknowledge that some of the information is relevant to acts included in Counts One and Four, such as the pre-2006 payments, the Island Pub payment, the Easter egg exchange, and the McDonald's payment.   Nonetheless, those acts were, as we will demonstrate, corroborated by evidence other than Allen's and Smith's testimony, such as Kohring's own statements to the FBI, *see* Tr. 12:75 (admitting that he received "personal gifts" from Allen, "in the range of maybe hundreds of dollars"), and various surreptitious recordings, *see, e.g.*, Gov't Exhs. 4a, 11a.

Even if the information about which Kohring now complains could have affected the jury's determination as to certain *transactions* — i.e., certain overt acts in Count One, or to certain things of value in Count Four — the jury's unanimous verdict as to the facts underlying Count Three demonstrates that the information would not have affected the jury's ultimate verdicts with respect to Counts One and Four.[3]   That is because the $17,000 solicitation underlying Count Three also

---

[3]   Count One charged Kohring with "Conspiracy to Commit Extortion and Attempted Extortion Under Color of Official Right and Bribery."  The government had to show that: (1) "there was an agreement between Bill Allen, Rick Smith and Victor Kohring to commit at least one crime as charged in the indictment"; (2) "the defendant became a member of the conspiracy knowing at least one of its objects and intending to help accomplish it"; and (3) "one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy with [the jury] agreeing on a particular overt act that you find was committed." Tr. 8:85.  In closing, the government made it clear this charge "specifically relate[d] to that $17,000 request, the payment that [Kohring] was seeking in suite 604." *Id.* at 30.

Count Four charged Kohring with "Bribery Concerning Programs Receiving Federal Funds." For this count, the government had to prove that: (1) " the defendant corruptly solicited or demanded for the benefit of any person or accepted or agreed to accept from a person something of value, with [the jury] agreeing on what that thing was, intending to be influenced or rewarded in connection with a business transaction or series of transactions of the state of Alaska"; and (2) "the business transaction or series of transactions involved something with a value of $5,000 or more."  Tr. 8:89-8:90.  In closing, the government outlined the following evidence of "things of value" for this count: "the thousand at the Island Pub, the money outside the McDonald's, the money in suite 604 on March 30th, the $17,000 payment that he solicited in suite 604, and the $3,000 job for Aaron Kohring."  Tr. 8:31.

constitutes an overt act and object of the conspiracy charged in Count One, and a thing of value in Count Four.[4]   While the cash payments Kohring identifies as the "most significant" to the government's case are included in the indictment as part of the ongoing corrupt relationship between Allen and Kohring, none is charged as a standalone substantive offense like Kohring's $17,000 solicitation.   Each cash payment contributed only a handful of overt acts out of dozens of acts involved in the conspiracy charge, and only a portion of the "things of value" referenced in Count Four.   As a result, both Count One and Count Four are amply supported by the jury's verdict on Count Three even if the cash payments are disregarded entirely.

In other words, this is not a case where "there is no way to know which objects the jury relied on in its decision to convict [the defendant] of conspiracy."   *United States* v. *Manarite*, 44 F.3d 1407, 1413 (9th Cir. 1995).   Given the jury's unanimous verdict on Count Three, it is readily discernable that the jury agreed at least as to the $17,000 solicitation, and that there is an adequate basis for the conviction on Counts One and Four.   *See Hedgpeth* v. *Pulido*, 129 S. Ct. 530, 532 (2008) (a conviction based on a general verdict supported by alternative theories of guilt, one of which is improper, is reviewed for harmless error); *cf. Griffin* v. *United States*, 502 U.S. 46, 49-50 (1991) (general verdict of guilty on count charging multiple-object conspiracy can be sustained even if evidence was insufficient to prove one object); *United States* v. *Lopez*, 803 F.2d 969, 976 (9th Cir. 1986) (judge's dismissal of one count does not undermine conspiracy verdict when jury convicted on other substantive counts constituting overt acts); *see also Brennan* v. *United States*, 867 F.2d 111, 115 (2d Cir. 1989) (convictions on substantive counts "operated like special verdicts" supporting

---

[4]   In contrast, the $17,000 solicitation was *not* included as part of the conduct charged in Count Two, the acquitted count.   *See, e.g.,* Tr. 8:28-30.

RICO conviction even though some predicate acts invalidated; court not left to speculate as to the grounds for the conviction); *United States* v. *Zvi*, 168 F.3d 49, 60 (2d Cir. 1999) (same); *United States* v. *Angiula*, 897 F.2d 1169, 1198-1200 (1st Cir. 1990) (same).  Thus, even if Kohring could demonstrate that some of the information about which he now complains was material as to certain transactions forming part of Counts One and Four, given the jury's verdict on Count Three, it is clear that he cannot establish a "reasonable probability that the suppressed evidence would have produced a different verdict," on those two counts.  *Strickler*, 527 U.S. at 281.

In any event, none of the information Kohring cites, whether considered individually or together, supports the argument that there is a reasonable probability that the jury's verdict would have been affected on *any* of the counts of conviction. We address Kohring's specific allegations *seriatam*.

### 1.      *Information Concerning Allen's Memory*

Kohring complains that the documents the government has provided to him in post-trial discovery suggest that over the course of many months of cooperation, interviews and debriefing sessions, Allen's memory of the details of some events was at times poor, that he recalled additional details as time went on, and that he at times became confused about time frames.  For example, Kohring highlights notes suggesting that, at times, Allen could not recall the specific reason for the $1000 payment he made to Kohring at the Island Pub dinner, and that he estimated varying amounts between $500 and $1000 in cash that he provided to Kohring during the March 30 "Easter egg" exchange.  He places particular emphasis on Allen's attorney's notes taken during debriefings to

suggest that the attorney thought Allen's memory of the McDonald's payment was "vague," and that at times Allen did not remember the context of certain meetings.[5]

Allen's memory issues were already on full display at trial, exploited by the defense and argued to the jury. This Court is of course well aware of Allen's demeanor at trial. Based on a reading of the transcript, however, Allen appears to have come across as what he was: a 70-year-old man with a significant communication obstacle as a result of his injury, and with little patience for details of dates or dollar amounts. Again, the government does not dispute that Allen was an important witness in this case and that he testified to certain key pieces of information about some of the transactions, but his memory issues came through clearly at trial.[6] Indeed, it was repeatedly necessary to refresh Allen's memory with documents in the course of both his direct and cross-examination. To the extent that inconsistencies and other failings in his memory were valuable for cross-examination, they were fully evident in the course of his direct testimony and readily available for that purpose. *See, e.g.*, Tr. 5:154-55, 184-86. They were also highlighted by Kohring

---

[5] It is worth noting that much of the "information" to which Kohring refers is hardly that; rather, most of the documents upon which he relies are scattered rough notes, and do not purport to represent a verbatim exchange of questions and answers. Both the context and the meaning of the notes are ambiguous hearsay, with much of the context missing. In certain instances, the notes may simply reflect the author's mental impressions and thoughts about areas that he feels needs further exploration, but they do not necessarily accurately reflect what Allen was saying. The rough notes are not admissible evidence, and given the restrictions on use of extrinsic evidence for impeachment, likely would be of limited value for that purpose.

[6] As a result, much of Allen's testimony involved rough estimates. *See, e.g.*, Tr. 5:123 ("I think three to four times"); *id.* ("usually six hundred to seven hundred"); *Id.* at 127 ("three or four is about as close as I can get"); *Id.* at 142 ("I think it was a couple of weeks after"); *Id.* at 147-148 ("So I give that and then I give him six to seven hundred – six hundred – seven hundred dollar bills – or not dollar bills but I think I had a – I think I had twenty – twenty-dollar bills"); *Id.* at 153 ("April, May. Might have been March.").

in closing argument.[7]  Thus, additional information concerning his recall and memory would have been largely cumulative.

Moreover, even if the defense had been able to use the undisclosed information concerning Allen's memory for cross-examination, there is no reasonable probability that such cross-examination would have influenced the jury's verdict.  Allen admitted that he was a corrupt businessman who gave cash to a number of legislators, including Kohring, *see, e.g.*, Tr. 5:139; lapses of memory about the circumstances and purpose of some of the payments is not surprising or particularly impeaching.  Indeed, courts have typically found little impeachment value in a witness's initial lack of recollection, even when it is in contradiction with the witness's later testimony (or vice versa).  For example, in *United States* v. *Collins*, 551 F.3d 914 (9th Cir. 2009), there was an undisclosed taped conversation between a cooperating witness ("CW") and another person in which the CW was told about a threat against him.  *Id.* at 917-18, 923.  At trial, the CW testified that he did not recall knowing about any such threat.  *Id.* at 924.  The defense argued that the threat gave the CW a motivation to lie, and that the CW was lying about not recalling the threat.  *Id.* at 923, 925.  The Ninth Circuit found that the tape did little to impeach the CW's claimed lack of memory, and the theory that the tape established a motive for the CW to lie was "attenuated at best," especially in light of the fact that there was substantial evidence that the CW was receiving benefits from the government for his testimony; additional evidence of motive to lie and bias in favor of the government was cumulative.  *Id.* at 925.

---

[7]  In closing, Kohring's counsel argued: "Mr. Allen's demeanor on the stand was rather pathetic.  Now, he has – and I don't mean to make fun of it – but he has memory problems, he has a brain injury.  He obviously drinks too much.  His demeanor on the stand – and remember his brain injury predated any of this that we're talking about here – but his demeanor on the stand was completely self-serving and pathetic."  Tr 8:48; *see also id.* at 57 (highlighting that Allen's plea agreement did not mention payments to Kohring prior to 2006).

*See also United States* v. *Amato*, 540 F.3d 153, 163 (2d Cir. 2008) (finding that witness initially said in undisclosed interviews that he did not recall writing a fraudulent invoice but at trial testified affirmatively that he had nothing to do with the invoice was a "minor point" and not material); *Johnson* v. *Mitchell*, 585 F.3d 923, 933-34 (6th Cir. 2009) (while initial failure to recall observations later testified to at trial was potential impeachment, nondisclosure did not undermine reliability of jury verdict).

  *Conley* v. *United States*, 415 F.3d 183 (1st Cir. 2005), provides as a useful contrast a case in which an initial failure to recall *was* material.  In that case, a police officer was charged with perjury and obstruction of justice with respect to a police brutality investigation; a group of officers had mistaken an undercover policeman for a fleeing suspect and beat him brutally.  *Id.* at 185.  There were only three witnesses at trial; the officer victim, the man he had actually been chasing, and one other officer who testified about his observations at the scene.  *Id.* at 186.  However, an undisclosed FBI-302 of an earlier interview stated that when he was interviewed, the officer "could not say what happened and therefore convinced himself that he actually saw someone or something."  *Id.*  The officer went on to "suggest that perhaps if he was hypnoti[z]ed he might truly recall what was going on versus what he indicates was tunnel vision."  *Id.*  The First Circuit concluded that this information was "highly impeaching," and given the importance of the witness's memory of what he observed during the incident to the conviction, was material.  *Id.* at 190-91.  The differences between, on the one hand, the dramatic "failure to recall" in contrast with the officer's later crucial testimony at trial in *Conley,* and, on the other, Allen's memory issues noted in some of the notes and memoranda cited by Kohring, are stark.

This view from the courts is consistent with the reality of human memory; it is widely understood by layperson and expert alike that details of events are often recalled only after thinking or talking about them, or, in the common trial practice, having one's recollection refreshed.  It would be a rare juror who would significantly discount a refreshed recollection that is consistent with other evidence in the case, and thus, typically evidence of an initial failure to recall does little to impeach.  Such evidence is thus not material, in that there is no reasonable probability that its disclosure could have affected the jury's verdict.

For similar reasons, in *Kott*, addressing identical memory concerns about the same witness during the same time period, this Court had little trouble rejecting the claim that the information about Allen's poor recall was material:

> In the court's view, the government easily has the better of the argument regarding this evidence.  Evaluated within the totality of the materials produced, taken in the context of an entire interview or document, considered in the proper time sequence, and compared to the very substantial evidence at trial from the surreptitious recordings, the newly disclosed evidence in this category is not material, because there is no reasonable probability that its timely production and use by the defense would have resulted in different verdicts.

*Kott*, Doc. 429, at 8-9.  The result should be the same here.

In any event, at best, even if the defense had been able to use the undisclosed information concerning Allen's memory for cross-examination, there is no reasonable probability that such cross-examination would have influenced the jury's verdict on Count Three.  Kohring has not even attempted to explain in his motion how it could have.  Allen's memory had no relevance to the video of Kohring approaching Allen during the legislative session, as the PPT bill was being debated, and asking for $17,000 to settle a "financial matter" that Kohring thought "potentially, could hurt [him] politically."  Gov't Exh. 11a.

**2.     *Information about Allen's Videotaped Easter Egg Money Payment to Kohring on March 30, 2006***

Kohring's complaint about the information concerning the March 30, 2006, "Easter egg" payment is a single e-mail sent by one of the prosecutors to his supervisors during trial preparation. Kohring argues (Mot. 22-23) that this e-mail contains *Brady* information because it suggests that the cash handed over to Kohring may have been only $200, rather than the $600 to $700 Allen testified to at trial, and thus arguably supports his "gift" defense. He also contends (Mot. 23) that it impeaches Allen's testimony generally about the sums of money he was paying to Kohring. More seriously, he argues (Mot. 3-5) that this e-mail demonstrates that the government first hid its "knowledge" of how little money was involved by "carefully" avoiding asking Smith the question, and then knowingly permitted false information to be presented to the Court by allowing the defense to introduce Smith's plea agreement. Kohring uses this traducement — which ignores what the e-mail actually says — to bolster an otherwise unsupported claim of willful misconduct. This argument is meritless.

First, the e-mail does not say that only $200 was paid by Allen in the course of the Easter egg exchange, or that Smith knew how much cash was involved. While the author of the e-mail indicates that Smith and Allen had "different recollections" as to the total amount of the exchange, and opines that Smith had a "somewhat better recall on the issue[,]" Bates No. 4672, in fact, the e-mail simultaneously establishes that Smith could not testify as to those facts because he had no knowledge of how much Allen handed to Kohring. The e-mail says that Smith's estimate of the amounts involved "speculati[on]" and "assump[tion.]" *Id.* Smith "believes" that he only gave Allen a single $100 bill. *Id.* He "speculat[es] to a certain degree" that Allen "may have asked him for money b[ecause Allen] didn't have any [$100 bills] on him." *Id.* Smith "assumes" Allen may only have had

"$20 bills if [Allen] did not have any hundreds with him." *Id.* The author of the e-mail then opines that "[i]f [Smith]'s assumptions are right," then Allen "may" only have paid Kohring $200. *Id.*

In fact, however, Smith's speculation and assumptions did not amount to knowledge of how much was paid, and Allen — the one who counted out the money and handed it over — was the only witness (apart from the tape itself) who could offer testimony on the point. This was made clear during Smith's testimony, when he was cross-examined by the defense about his knowledge of the amount of money involved during the Easter egg payment. Tr. 4:151. The obvious reason Smith was not asked about this by the government at Kohring's trial was not to obscure some conflict between Smith's recollection and Allen's recollection, but because, as the e-mail makes clear, Smith had no personal knowledge of how much Allen actually paid Kohring and could merely speculate.

The actual exchange on cross-examination between defense counsel and Smith about the plea agreement, which Kohring neglects to quote in his motion, makes this clear:

Q:     [Reading from the plea agreement] "Two separate cash payments totaling as much as one thousand one hundred dollars was given by Allen and Smith to A in the hotel room." Correct?

A:     Correct.

Q:     And that was the day when you were talking about Easter eggs and the loan, correct?

A:     Correct.

Q:     Okay. And we're – we're say – the reason you say approximately is – *or do you know for a fact how much was given?*

A:     *No, I do not.*

Tr. 4:151 (emphasis added).[8]  Thus, on cross-examination Kohring exploited Smith's lack of specific knowledge of the amount of money involved, seeking to emphasize that Allen provided the only evidence of how much money was actually involved on the videotaped exchange, which shows Smith counting off what are apparently $100 bills.  There was nothing improper about the government permitting the defense to seek to make this point, and in doing so, the government did not violate *Napue* v. *Illinois*, 360 U.S. 264 (1959), as Kohring claims.  Mot. 64-67.[9]

Furthermore, the facts upon which Smith's speculation was based were known to the defense and brought out at trial.  Indeed, from the tape itself, the defense (and the jury) knew that Allen asked Smith if he had any "hundreds."  Gov't Exh 11a, at 18.  This is the information Smith relied on to "speculat[e] to a certain degree" that Allen may not have had any $100 bills.  Bates No. 4672.  Allen

---

[8]  Allen had estimated that he paid Kohring as much as $1000, Smith acknowledged handing over an additional $100 bill, and that is what Smith's plea agreement reflected.  Smith's plea agreement states as part of the factual basis that the government would be able to offer evidence that during the Easter egg exchange, Kohring was given payments "totaling as much as one thousand one hundred dollars."  *United States* v. *Smith*, 3:07-cr-00058, Doc. 8, Attach. A, at 3.

[9]  Kohring also claims (Mot. 64-67) that when the government permitted his attorney to offer Smith's plea agreement in evidence, it was a violation of *Napue*.  In *Napue*, the Supreme Court set aside a verdict after the State's principal witness testified, in response to questioning by the prosecutor, that he had received no promise of consideration from the State in connection with his testimony, when in fact that same prosecutor had made such promises.  The Court held that it is a violation of due process for the State to knowingly use false testimony to obtain a conviction.  360 U.S. at 269.

In this case, the government did not use, knowingly or otherwise, false testimony to obtain a conviction.  Kohring's attorney used Smith's plea agreement in cross-examination to make it clear to the jury that Smith did not know how much money was involved in the Easter egg payments, and therefore could not corroborate Allen's testimony that it was "about $600 to $700."  The plea agreement does not state a fixed sum and it does not identify the source of the estimated amount ("as much as $1100").  The government already made clear that the sum was an estimate when Allen testified.  Thus, there is nothing false about the estimate in Smith's plea agreement.

testified at trial that this was probably the case. Tr. 5:147.[10]  The more important point is that this entire exchange was on tape for the jury to consider.  Whatever the amount of money involved, the corrupt nature of the exchange — the cash handed to a legislator by a lobbyist during a legislative session, ostensibly for his children, but never reported as gifts, followed by an immediate offer from the legislator to do whatever the lobbyist wanted — was up to the jury to assess.

Kohring also suggests (Mot. 22-23) that the prosecutor's impression articulated in this e-mail — that Smith had "somewhat better recall" about the Easter egg episode — was *Giglio* impeachment information that should have been turned over.  But, a prosecutor's opinions and mental impressions about witnesses generally are not discoverable under *Brady*.  *Morris* v. *Ylst*, 447 F.3d 735, 742-43 (9th Cir. 2006) (memorandum stating opinion that state's witness had perjured herself not *Brady*/*Giglio*); *Williamson* v. *Moore*, 221 F.3d 1177, 1182 (2d Cir. 2000) ("opinion work product enjoys almost absolute immunity" from discovery, and prosecutor's impressions in notes not discoverable under *Brady*).  In any event, Smith's recall of the Easter egg incident, and how it compared to Allen's, was on full display for the jury, as each of them testified about the event.

Kohring's citation (Mot. 23) of *United States* v. *Brumel-Alvarez*, 991 F.2d 1452 (9th Cir. 1993), in support of the proposition that the prosecutor's impression should have been disclosed in fact only reveals the weakness of his argument; *Brumel-Alvarez* involved an undisclosed document covered by the *Jencks* Act (because it was written by an agent who was a witness at trial about the investigation underlying the case), and contained information that the confidential informant in the case had lied during the investigation, had seized control of the investigation from the government

---

[10]  In contrast to Smith's "belie[f]" as recounted in the e-mail that he only passed Allen a $100, Bates No. 4672, Smith can be seen on the video counting out a number of bills, which he hands to Allen; Allen in turn hands the bills to Kohring.

agents and was manipulating them, and had thwarted the agents from taking investigative steps that might have developed exculpatory evidence. 991 F.2d at 1461-62. This is a far cry from a prosecutor's e-mail reflecting his view that one witness had a *somewhat* better recall of a particular event than another witness.

More fundamentally, nothing about the information in the e-mail could have affected the jury's verdict with regard to Count Three, which is based on Kohring's solicitation of assistance with a $17,000 credit card debt preceding the Easter egg exchange. Indeed, Kohring does not claim otherwise. Nor could he. Given the videotape evidence, it would make little sense for Kohring to claim that if the amount of money involved in this videotaped transaction was $200 as opposed to $600, the jury would have somehow viewed the preceding request for $17,000 differently. Thus, there is no reasonable probability that information about Smith's speculation on the amount of cash exchanged on the videotape would have influenced the jury's verdict that Kohring's solicitation of $17,000 immediately preceding that exchange was a criminal act. The e-mail was therefore immaterial to Kohring's conviction on Count Three.

### 3.    *Information About Allen's Relationship with Kohring*

Kohring complains (Mot. 37-47) that he did not receive rough notes suggesting that at times during the course of the investigation, Allen may have characterized the payments to Kohring as having been made out of friendship or pity. The jury, however, heard Allen describe on tape his power and control over Kohring in the crudest terms, Gov't Exh. 4a, at 5 ("he would kiss our ass"), and Allen specifically cited his corrupt payment to Kohring at the Island Pub as an "example" of "getting dirty" in order "to produce." *Id.* That evidence was corroborated by Kohring's $17,000 solicitation for a debt that could "hurt [him] politically" and Kohring's offer to "help you guys" after

34

he stuffed cash into his pocket.  There was no history of friendship or much socializing, other than Allen paying for Kohring's meals in Juneau, between the two men; if Kohring had ever been in Allen's home it was during fundraisers.  Tr. 5:117.  Allen had never been in Kohring's home and had never met his family, *id.*, and when Kohring called Allen, it was at the office, *id.* at 118.  Allen did not even know where Kohring lived.  *Id.*  Indeed, Kohring did not list Allen and Smith as "personal friends" on his own computer, he listed them as "supporters."  Tr. 12:96-106; Gov't Exh. 109.  Given such evidence, it is implausible to suggest that had the defense been in possession of ambiguous rough notes suggesting that at times in interviews Allen said he paid Kohring out of friendship and pity — statements he repeated in his testimony at trial — the jury's verdict would have been affected.[11]

In addition, as in *Kott*, the government provided a *Brady* letter before trial disclosing Allen's mixed motives for providing money to Kohring.  *See* 10/12/2007 Letter from Edward P. Sullivan to John Henry Browne, Gov't App. at 2 ("Mr. Allen has advised the government that his motivation in providing these financial benefits to Mr. Kohring was partly because he felt sorry for Mr. Kohring regarding his personal financial situation and partly so that Mr. Kohring world take official acts on the part of VECO Corporation.").  Kohring also made extensive use of Allen's pity and friendship for Kohring on cross-examination, Tr. 6:35, 39, 56-58, 61-64, and in closing, Tr. 8:56-57.  Thus,

---

[11]  Equally implausible is Kohring's complaint (Mot. 42-43) that information that his "signature sign off" was to offer others help and that he did so without expecting anything in return was suppressed material information.  Besides the fact that this Court ruled this habit evidence inadmissible, the jury saw and heard an example of Kohring's "signature sign off" as he pocketed the Easter egg payment, before plotting with Allen and Smith on how he could best help them with the PPT.  Gov't Exh. 11a, at 20 ("What can I do at this point to help you guys?  Any – anything? . . .  Just keep lobbying my colleagues for a governor's, ah, plan, right?").

although Kohring could arguably have used information in the 302s and notes to cross-examine Allen further, it is unlikely that it would have altered the outcome of the trial.

Finally, this is another category of prior inconsistent statements that Kott raised and this Court rejected.  Kott made the same argument based on similar — indeed, often the same — jottings in rough notes indicating that Allen made payments based on friendship.  Essentially the same *Brady* disclosure letter was sent to Kott.  Furthermore, there was a far stronger argument in *Kott* that the two men had a relationship that could plausibly be characterized as "friendship."  As quoted above, *supra* at 29, this Court had no trouble disposing of this argument in *Kott*.  Doc. 429, at 8-9.  The result should be the same here.  Indeed, the notion that Allen was handing cash to Kohring solely because he regarded him as a friend or out of pity, rather than at least in part because of his position as a legislator, is incredible and it is unpersuasive to argue that the jury would have changed its verdict based on these notes.

### 4.	Information Regarding the FBI's Surveillance of the Island Pub Dinner

Kohring claims (Mot. 32-34) that the FBI's failure to observe the handover of cash while surveilling the Island Pub dinner on February 23, 2006, was favorable and material information that the government withheld.  He is incorrect as a matter of law and fact.

Kohring concedes (Mot. 32) that he was provided information in the form of a Title III "re-up" affidavit for the monitoring device in the Baranof suite, and that the affidavit states that the surveillance of the Island Pub dinner "provided limited evidence to further the investigation."  Mot. App. F.  This in and of itself put Kohring on notice that the surveillance had not observed Allen hand Kohring cash (because obviously that would have "further[ed] the investigation"), and information known to the defense cannot be *Brady*.  *See, e.g.*, *United States* v. *Jeffers*, 570 F.3d 557, 573 (4th Cir.

36

2009) ("[W]here exculpatory information is not only available to the defendant but also lies in a

source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of

the *Brady* doctrine. Additionally, there is no *Brady* violation if the defense is aware of the evidence

in time to reasonably and effectively use it at trial.") (citations and internal quotation marks omitted);

*United States* v. *Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987) ("[N]o *Brady* violation occurs if the defendant

knew or should have known the essential facts permitting him to take advantage of any exculpatory

evidence.").

In fact, the government provided Kohring even more detailed information about the

surveillance, which he fails to acknowledge to the Court.  In the Title III "re-up" affidavit for the

Baranof suite monitoring device, filed at the end of March 2006, and provided to Kohring before trial,

paragraph 55 states:

> On February 23, 2006, the FBI surveilled a meeting between ALLEN, SMITH, and
> KOHRING at the Island Pub in Juneau, Alaska.  Although the surveillance was able to
> confirm the existence of the meeting, based upon the location of the FBI personnel and
> the configuration of the establishment, the surveillance was unable to yield any
> information about the subject matter of the conversation.

App. at 7.  Thus, contrary to his claim, Kohring was informed that the FBI surveilled the Island Pub

dinner, and was unable to gather any significant evidence — such as the observation of a monetary

exchange — to further the investigation.

In any event, the most powerful evidence of the payment is the surreptitiously videotaped

conversation a week later between Allen and Smith in which Allen told Smith that after Smith left

the table, Allen "gave him a 1000."  Gov't Exh. 4a, at 5.  The videotape also contains Smith's

confirmation that he knew of Allen's payment, and that such knowledge was the reason he left the

two men alone.  *Id.*  Kohring offers no reason why Allen would have lied to Smith about having made

37

a payment to Kohring.  And, indeed, the recording pre-dated any decision by Allen to cooperate with the government, so he would not have had any motive to fabricate any aspect of the conversation.

Finally, even if it could be argued that the FBI's unsuccessful surveillance of the Island Pub dinner on February 23, 2006, somehow calls into question the videotaped conversation a week later between Allen and Smith, it would not have influenced the jury's verdict on Count Three.  The FBI's surveillance had no relevance to the video of Kohring brazenly approaching Allen during the legislative session, as the PPT bill was being debated, and asking for $17,000 to settle a "financial matter" that Kohring thought "potentially, could hurt [him] politically."  Gov't Exh. 11a.

### 5.     *Information About Smith*

Kohring claims (Mot. 47-52) that the government failed to disclose two categories of information about Smith that he argues would have been useful fodder for cross-examination.  First, he points (Mot. 47-49) to rough notes indicating that Smith stated that he did not know what Kohring thought Allen's payments were for, and that Smith thought Kohring was beholden to Allen and VECO because of campaign contributions, not the cash gifts.  Second, he focuses (Mot. 49-52) on the fact that Smith and the lead FBI agent in this case played golf together once, and that that agent indicated in a post-trial interview that she was spending time with Smith because she was concerned about his psychological state.  These claims are without merit.

Smith testified that Allen's intent in making cash payments to Kohring was to "keep [him] on board on political issues that we were in favor of."  Tr. 4:49-50.  In contrast, the interview notes (which appear to be notes of a trial-prep session) indicate that Smith stated that he did not "know" what Kohring thought; the notes went on to state that he should not "speculate" about that, and that he should instead focus on his and Allen's intent.  Bates No. 243.  This is not, as Kohring claims,

"inconsistent" with Smith's testimony.  Mot. 48.  The notes merely reflect that Smith did not have personal knowledge about Kohring's intent, that he therefore could not speculate about it when he testified, and that instead, he should focus on his own intent and that of Allen.  Bates No. 243. Entirely consistent with the notes, and similar to his speculation regarding the Easter egg exchange, Smith never testified about his own speculation regarding what Kohring thought.  And, he was not asked to do so; as the notes suggest, he testified about his own intent (and that of Allen) in making the payments.  Tr. 4:49-50.

Nonetheless, information about what Smith believed Kohring thought about cash payments does not create a reasonable probability that the jury's verdict would have been different, and certainly not as to Count Three, where Smith's beliefs and speculation have no bearing on Kohring's videotaped request for $17,000.  Nor does information that Smith once golfed with the lead FBI agent and her spouse, or that she was concerned about Smith's mental state bear on Kohring's convictions. Nothing in the notes even hints that Smith was unable to understand, observe or recall the events about which he testified.  His testimony was coherent and straightforward, and it is implausible to suggest that the jury's verdict would have been affected had it been informed that in the months leading up to the trial, Smith was upset and depressed about the criminal case pending against him. The FBI agent's interview does not contain information — and the government is aware of none — that Smith was hospitalized, receiving treatment for a psychiatric condition involving hallucinations or inability to perceive reality, or even that he was in fact suicidal.  The interview shows only that she was concerned about that possibility.  In any event, while this Court has already held that the

latter information should have been produced to the defense, the failure to do so was not material, in that it "does not undermine confidence in the jury verdict."  *Kott*, Doc. 429, at 10-11.[12]

### 6.    *Information About Prewitt's Opinion of Kohring*

Kohring contends (Mot. 52-56) that the government failed to disclose information that Frank Prewitt — an individual who was not involved in the investigation of this case — expressed his own subjective opinion that Kohring did not appear to be corrupt a year before the events that formed the centerpiece of this case even occurred, and that this failure amounted to a *Brady* violation.  That claim is without merit.

Frank Prewitt, a former consultant for the prison industry, was not involved in the investigation of Kohring during 2006.  Instead, Prewitt was cooperating with the government in a

_____

[12]  The government notes, with all due respect, that, unlike this case, the cases cited by the Court in *Kott*, and those that Kohring cites in his motion, involve information directly related to a witness's credibility or competency, rather than what are typical worries that prosecutors and investigators have about witnesses in their cases, whether they are victims of violent crimes, victims who are fearful of the defendant, or cooperating coconspirators who are concerned about their own criminal exposure.  *See United States* v. *Pryce*, 938 F.2d 1343, 1345-46 (D.C. Cir. 1991) (witness having hallucinations); *United States* v. *Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) (witness hospitalized for year and a half for severe depression); *United States* v. *Heath*, 528 F.2d 191, 192-93 (9th Cir. 1975) (improper to restrict defense cross-examination as to competency of deaf-mute, allegedly mentally handicapped witness).  Indeed, the government is aware of no previous decision holding that the government is required to disclose to the defendant the prosecution team's mental impressions about its witnesses, and there are extremely sensitive issues of personal privacy and dignity created by the notion that the prosecution team's impressions of stress, nervousness and anxiety must be reported to the defense.  *Cf. United States* v. *Butt*, 955 F.2d 77, 82-83 (1st Cir. 1992) (finding no abuse of discretion to exclude cross-examination about depression and suicide attempt several years before, and stating "[W]e are aware of no court to have found relevant an informally diagnosed depression or personality defect.  Rather, federal courts appear to have found mental instability relevant to credibility only where, during the time frame of the events testified to, the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as schizophrenia, that dramatically impaired her ability to perceive and tell the truth."); *United States* v. *Antone*, 981 F.2d 1059, 1061 (9th Cir. 1992) (in absence of evidence of psychosis, mental defect or addiction, or serious mental condition at time of events about which witness testified, no error in non-disclosure of psychiatric records).

separate ongoing investigation over a year earlier into allegations that consulting contracts were being offered to legislators in exchange for official acts, primarily in relation to a private prison proposal. *See* Tr. 12:22-46.  In the course of that investigation, Prewitt ate dinner with Kohring in February of 2005, in order to sound him out.  During that dinner, the conversation turned to Bill Allen and VECO. *See* Gov't Exh. 27a.  Kohring told Prewitt that they were "very aggressive," and that "when they need something, they really let me know loud and clear."  *Id.* at 75.  On tape, Kohring specifically described Allen's request that Kohring release a bill from his committee, which was one of the legislative favors Allen testified he had asked Kohring for during the pre-2006 period.  *Id.* at 76.

Although the government called Prewitt as a witness, and put on the surreptitious recording of his conversation with Kohring in order to corroborate Allen and Smith's testimony about asking Kohring to move a bill out of committee, Prewitt was not an important witness in this case.  Indeed, Kohring concedes in his motion that he is "not entirely clear why the government called Mr. Prewitt as a witness."  Mot. 53.  Nevertheless, as part of the government's attempt to proceed in an abundance of caution following remand from the Ninth Circuit, it has provided broad disclosure of all information — even of, at times, tenuous relevance — to Kohring.  This included the disclosure that after the dinner meeting in February 2005, Prewitt expressed the belief that Kohring was not dirty or corrupt, and that if he were corrupt, he may not realize it.  Mot. App. D.

Kohring claims (Mot. 54) that this was "admissible exculpatory evidence" that would have been a "powerful element" in Kohring's defense had it been disclosed pretrial.  It is unlikely that Prewitt's view would have been admissible because Rule 704(b) bars opinion testimony about "whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.  Such ultimate issues are matters for the trier of fact alone."

41

Even if it were admissible character evidence, however, there is no probability that the jury's verdict would have been affected. Prewitt's subjective belief about Kohring, expressed a year before the events that were the centerpiece of this indictment, and thus without any knowledge of Kohring's later solicitation of $17,000, is not relevant to Kohring's guilt, including on Count Three. *See United States* v. *Fernandez*, 559 F.3d 303, 319 (5th Cir. 2009) (subjective belief of IRS investigator who concluded after an earlier investigation of defendant that he was not engaged in money-laundering or tax evasion not relevant to guilt of defendant, and even if favorable, not material).

### 7.  *Information About Allegations of Allen Engaging in Sexual Misconduct*

Kohring next argues (Mot. 56-63) that the fact that Allen was under investigation for sexual exploitation of minors, and that Allen procured an allegedly false affidavit from one of his minor victims, was favorable and material information. As Kohring acknowledges in his motion, this claim is a reprise of one already raised and rejected by this Court in *Kott.*  It should be rejected here as well.

Allen's alleged sexual misconduct and the investigations related to it were explored in detail in this Court's opinion in *Kott*. This Court concluded that information about Allen's "impeachable past" should have been disclosed to Kott, because it was relevant to potential bias on Allen's part; if Allen had known of the investigation into his conduct with minors, he may have hoped that his cooperation with the government might be "beneficial in connection with that criminal exposure." Doc. 429 at 16. Nevertheless, the Court concluded that it would have excluded the evidence under Rule 403 because it created a serious risk of confusion of the issues:

> Thus, admission of the evidence creates a serious danger of confusing the issues which the jury actually needs to decide – whether Kott is guilty of the crimes charged, not whether Allen is guilty of sex crimes. It also risks misleading the jury by causing them to focus on Allen's escapades at the expense of their evaluation of all the other evidence.

Finally, it bears emphasis that Kott had ample opportunity to show, and at trial did show, Allen's bias based on the substantial value of Allen's co-operation concerning punishment for the public corruption crimes to which he had pled guilty. A difference of many years in prison turned on the value of Allen's cooperation, a consideration which made the jury well aware of the powerful incentive Allen had to shade his testimony in favor of the government. Thus, evidence regarding Allen's involvement with the minors has much less probative value than it would were it the only incentive for Allen to assist the government. Put another way, evidence of Allen's involvement with the minors may be described as needlessly cumulative on the question of Allen's incentive to help the prosecution. All things considered, it is this court's view that the probative value of the evidence was substantially outweighed by the risks just discussed. The evidence would have been excluded under Rule 403.

*Id.* at 17. The same facts and analysis apply here, and the result should be the same.[13] Even if the information about the allegations had been disclosed, this Court would have barred its admission, and thus it could not have affected the jury's verdict.

Kohring seeks to distinguish the Court's holding in *Kott* by arguing that the case against Kott was stronger than the case against him. However, nothing in this Court's analysis of the admissibility of the child-sex information involving Allen hinged on the strength of the case; rather, the Court properly focused on the probative value of the evidence (minimal in light of the substantial bias information about Allen already available for cross-examination) against its potential for confusing

---

[13] An FBI-302 indicates that in 2004, the child victim initially alleged that she had signed a false affidavit at Allen's request saying that she had not had sex with him. Bates No. 4666. In 2007, shortly before Kohring's trial, she recanted that allegation, stating that the affidavit was her idea, in an effort to help Allen fight an extortion attempt by another woman. Bates No. 4668. Allen had also denied ever having asked anyone, including the child victim, to make a false statement under oath. Bates Nos. 974, 948.

Although Kohring refers to this information in his motion (Mot. 60-62), he does not develop the argument, and offers no rebuttal to this Court's conclusion in *Kott* that the information was not material because it could not be proven extrinsically. *Kott*, Doc. 429, at 18. Therefore, at most, Allen could have been asked about it in cross-examination, and he "surely would have repeated the denial." *Id.* As a result, this Court concluded that this line of inquiry would not have been of significant assistance to the defense, and therefore it was not material. Again, Kohring offers no reason why the result should not be the same here.

43

the issues and misleading the jury (substantial in light of its inflammatory nature).  Here, the Court

should reach the same result.  Moreover, separate and apart from the Rule 403 analysis, Kohring's

argument fails under a straightforward materiality analysis.  "[E]vidence is material only if there is

a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different."  *Bagley*, 473 U.S. at 682.  Because the evidentiary

significance of the child-sex information is minimal in light of the substantial impeachment

information already available to Kohring on the issue of Allen's incentive to curry favor with the

government, any failure to disclose such information was not "material" under *Bagley*.[14]

### B.      The Remedy for any *Brady* Violation Should Be a New Trial, Not Dismissal of the Indictment

Kohring argues (Mot. 64-70) that the indictment against him should be dismissed by this

Court because of "egregious, calculated and intentional" discovery violations.  Even assuming that

Kohring could demonstrate that favorable and material evidence was suppressed in violation of

*Brady*, which he cannot, such a showing would warrant only a new trial, not a dismissal of the

indictment.  In other words, Kohring's allegations about the government's conduct in this case, even

if they were true, do not provide grounds for dismissing the indictment; he has not shown how he has

been prejudiced, much less *substantially* prejudiced, and he has not explained how a new trial would

not remedy any alleged *Brady* violation.

The "*Brady* right . . . is a *trial* right."  *United States* v. *Moussaoui*, 591 F.3d 263, 285 (4th Cir.

2010) (emphasis original).  It exists "to preserve the fairness of a trial verdict and to minimize the

---

[14]   Indeed, given Rule 403's disposition towards inclusion, the Rule 403 balancing test is substantially less restrictive than *Bagley*'s materiality test.  Therefore, if Rule 403 precludes the admission of this information, then, *a fortiori*, the information cannot be material.

chance that an innocent person would be found guilty." *Id.*; *Weatherford* v. *Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case and *Brady* did not create one."). The purpose of *Brady*, and the Supreme Court's later cases applying it, is to protect the fairness of the *trial* and to guard against the risk that an innocent person might be found guilty because the government withheld evidence.  For that reason, when a "defendant's right to a fair trial has been prejudiced" by a *Brady* violation, the "remedy" is a new trial.  *Monroe* v. *Blackburn*, 748 F.2d 958, 960 (5th Cir. 1984); *Giglio*, 405 U.S. at 153-54 (explaining when the suppression of material evidence or the solicitation of false testimony justifies a new trial).

In the Ninth Circuit, however, if a district court finds that a *Brady* violation is the result of willful, flagrant, or bad faith behavior on the part of the prosecution, *Chapman*, 524 F.3d at 1085, and when the defendant suffers "*substantial* prejudice," and where "no lesser remedial action is available," *id.* at 1087 (emphasis added; citations and quotations omitted), the court can exercise its supervisory powers to dismiss the indictment with prejudice.  *Id.* at 1086 ("*Brady* violations are just like other constitutional violations.  Although the appropriate remedy will usually be a new trial, a district court may dismiss the indictment in the Ninth Circuit when the prosecution's actions rise . . . to the level of flagrant prosecutorial misconduct."); *see also United States* v. *Simpson*, 927 F.2d 1088, 1091 (9th Cir. 1991) (explaining that dismissing an indictment with prejudice "encroaches on the prosecutor's charging authority," and therefore dismissal is only permitted "in cases of flagrant prosecutorial misconduct"); *Kojayan*, 8 F.3d at 1318 ("In determining the proper remedy, we must consider the government's willfulness in committing the misconduct and its willingness to own up to it.").  "[A]ccidental or merely negligent governmental conduct," however, "is insufficient to establish flagrant misbehavior."  *Chapman*, 524 F.3d at 1085.

Given that the due process right in *Brady* is a trial right, the violation of which is remedied by granting a new trial, *Chapman*'s rationale for dismissing an indictment based on a *Brady* violation is questionable.  Indeed, no other circuit has employed a similar rationale.  Even assuming, as this Court must, that *Chapman*'s rationale is sound, the case is clear that a court may dismiss an indictment under its supervisory powers only in extremely limited circumstances: (1) in a case involving "flagrant prosecutorial misconduct," and (2) when the defendant suffers "*substantial* prejudice," and, significantly, where "no lesser remedial action is available."  *Id.* at 1087 (emphasis added) (citations and internal quotation marks omitted); *cf. United States* v. *Welborn*, 849 F.2d 980, 985 (5th Cir. 1988) ("The supervisory authority of the district court includes the power to impose the extreme sanction of dismissal with prejudice only in extraordinary situations and only where the government's misconduct has prejudiced the defendant.").

While Kohring asks this Court to dismiss the indictment essentially to punish the government for what he claims are "egregious, calculated and intentional" *Brady* violations, Kohring fails to offer any evidence to support his overheated rhetoric.  Nowhere in all the thousands of pages of ordinarily privileged notes and emails that have been provided to him does he point to any evidence of any plot to violate his rights or deliberate decision to withhold known *Brady* information.[15]  Nor does he explain anywhere in his 71-page motion why the normal remedy for a *Brady* violation, a new trial,

---

[15]  As in *Kott*, the government has given Kohring extraordinary access to the prosecutors' files since the time it moved to remand this case.  The government provided Kohring not only materials that appeared at the time of the remand to be information that it may have been required to disclose before trial (thus prompting the government's motion to remand), but also a significant amount of additional material that lay beyond any obligation of disclosure.  The government did so, given the unique circumstances of this case, in order to assure the defendant, the Court, and the public that the Department of Justice takes its discovery obligations seriously and to allow Kohring the fullest possible opportunity to evaluate the fairness of his trial.

is insufficient to cure any prejudice he suffered.  Instead, he asserts only that the government acted in bad faith and that had the information about which he complains been available to him, it would have led the jury to a different verdict.  Of course, a *Brady* violation, by definition, means that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Bagley*, 473 U.S. at 682.  But, again, the remedy for such a violation is a new trial.  *See, e.g.*, *Giglio*, 405 U.S. at 153-54 (explaining when the suppression of material evidence or the solicitation of false testimony justifies a new trial).  Were a "different result" the only prejudice required for the "extreme" step of dismissing an indictment, as Kohring suggests, every *Brady* violation would result in the dismissal of the indictment.  That cannot be the case.  *See Welborn*, 849 F.2d at 985 (district court "exceeds the proper bounds of its power to order dismissal of an indictment with prejudice when it fails to consider whether less extreme sanctions might maintain the integrity of the court without punishing the United States for a prosecutor's misconduct"); *United States* v. *Hasting*, 461 U.S. 499, 506 (1983) (remedies should be "narrowly tailored to deter objectionable prosecutorial conduct").[16]

*Chapman*, the only reported court of appeals case we have found upholding the dismissal of an indictment for a *Brady* violation, is clear on this point.  Whatever the merits of *Chapman*'s

---

[16] Nor is it simply enough to establish "egregious, calculated and intentional" conduct by the government.  *See Cooper* v. *Brown*, 510 F.3d 870, 924 (9th Cir. 2007) ("Under *Brady*, the prosecution's suppression of evidence favorable to an accused 'violates due process where the evidence is material either to guilt or to punishment *irrespective of the good faith or bad faith of the prosecution.*'" (emphasis added) (quoting *Brady*, 373 U.S. at 87) (emphasis added)); *United States* v. *Reyes*, 577 F.3d 1069, 1077-79 (9th Cir. 2009) (finding that the prosecutor committed "misconduct" by making "prejudicial" "deliberate false statements" to the jury in his closing argument, but concluding that the conduct was not so egregious as to warrant dismissal).  Indeed, even in the face of the egregious misconduct in *Napue*, the Supreme Court did not order dismissal of the indictment, but simply reversed the conviction.  360 U.S. at 272.

rationale, the Ninth Circuit in that case found that the defendant suffered "substantial prejudice," and a retrial would not remedy that prejudice because it would allow the government to "salvage" a "poorly conducted prosecution" with "myriad weaknesses" and which was "faltering."  524 F.3d at 1087.  By contrast, here, the government presented a strong case against Kohring, based largely on videotaped evidence.  Thus, a new trial would cure any prejudice Kohring suffered from the alleged *Brady* violations.

United States v. *Lyons*, 352 F. Supp. 2d 1231 (M.D. Fla. 2004), which Kohring cites in his motion (Mot. 68), is instructive on this point.  In that case, the district court found not only "a prosecution run amuck," *id.* at 1233, responsible for "numerous and flagrant *Brady* and *Giglio* violations," *id.* at 1243, but also that the government engaged in "unconscionable delay" in complying with the district court's post-trial orders to produce certain documents, which resulted in serious prejudice to the defendant who had "already served the maximum sentence the Government has called for. . . ," *id.* at 1251.  The court underscored the importance of the prejudice the defendant suffered by the delay, acknowledging that "[i]f, within a reasonable period after trial, the Government had revealed its *Brady* and *Giglio* violations, a new trial order may have been an appropriate remedy."  *Id.*

Kohring cites to a number of other inapposite outrageous government conduct cases, many of which uphold the denial of dismissal as a remedy and all of which involve facts strikingly different than those alleged here.  *See* Mot. 67-69 (citing *United States* v. *Linton*, 502 F. Supp. 861, 865-66 (D. Nev. 1980) (denying motion to dismiss premised on alleged misconduct before the grand jury)); *United States* v. *Boone*, 437 F.3d 829, 841-42 (8th Cir. 2006) (upholding denial of motion to dismiss premised on alleged threatening and intimidating conduct by FBI agent); *United States* v. *Voigt*, 89

F.3d 1050, 1064-65 (3d Cir. 1996) (upholding denial of motion to dismiss premised on alleged deliberate intrusion into the attorney-client relationship); *United States* v. *Wang*, 1999 WL 138930, at *35-37 (S.D.N.Y. Mar. 15, 1999) (dismissing indictment where government's actions resulted in unavailability of crucial defense witness at trial); *Government of Virgin Islands* v. *Fahie*, 419 F.3d 249, 258 (3d Cir. 2005) (reversing the district court's dismissal of the indictment for prejudice where the government failed to disclose a significant ATF report that it knew about three months before trial); *United States* v. *Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (affirming district court's denial of motion to dismiss where a government cooperator engaged in sexual activity with the defendant and introduced her to cocaine and trafficking cocaine); *United States* v. *Marshank*, 777 F. Supp. 1507, 1529-30 (N.D. Cal. 1991) (upholding dismissal of indictment where government actively collaborated with cooperator's defense attorney in developing criminal case against one of defense attorney's other clients); *Kojayan*, 8 F.3d at 1325 (vacating convictions where the government asserted there was no agreement with its star witness, a co-conspirator whose testimony was critical to the defendants' convictions, when the government had in fact entered into a cooperation agreement with him)). If anything, these cases highlight that Kohring's case is easily distinguishable from cases where district courts have dismissed indictments based on the prosecution's discovery violations — those cases all involved more egregious conduct than that *alleged*, let alone proven, by Kohring in this case.

## V.    CONCLUSION

Kohring was a corrupt public official who betrayed the public trust in exchange for cash handed to him by businessmen seeking to buy his official acts, exchanges captured on tape for the jury. He received a fair trial that established his guilt beyond a reasonable doubt. The government

does not dispute that the trial team made mistakes in handling discovery in this case.  There are many reasons for those errors, but the government does not seek to offer excuses here.  In an effort to avoid these problems in the future, the Department has taken significant steps to establish clear guidelines and better training.  We respectfully submit that in this case, despite any mistakes, Kohring received "a fair trial," *Agurs*, 426 U.S. at 108; that there is no "reasonable probability that the suppressed evidence would have produced a different verdict," *Strickler*, 527 U.S. at 281; and that "confidence in the outcome of the trial" remains.  *Bagley*, 473 U.S. at 678.

Respectfully submitted,

LANNY A. BREUER
Assistant Attorney General

KAREN LOEFFLER
United States Attorney

 */s/ James M. Trusty*
JAMES M. TRUSTY
Deputy Chief, Gang Unit

 */s/ Kevin Feldis*
KEVIN FELDIS
Assistant United States Attorney
Chief, Criminal Division

KEVIN R. GINGRAS
Attorney, Appellate Section

JO ANN FARRINGTON
Assistant United States Attorney
United States Attorney's Office
District of Alaska

PETER M. KOSKI
Trial Attorney, Public Integrity Section
Criminal Division
United States Department of Justice

Dated: June 4, 2010

50

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this date, I caused a true and correct copy of the foregoing Response to Defendant's Motion to Dismiss, or in the Alternative, for an Order Granting a New Trial be electronically filed and it is available for viewing and downloading from the ECF system.


   _/s/ Kevin R. Gingras_
Attorney
Appellate Section, Criminal Division
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530


Dated: June 4, 2010